**NATIONAL LABOR RELATIONS BOARD**
**v. M. E. BLATT CO.**

Nos. 8493, 8494.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 20, 1943.

Decided June 9, 1944.

Roman Beck, N.L.R.B., of Washington, D. C. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel,

and Jacob I. Karro and Platonia P. Kaldes, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Samuel A. Goldberg, of Philadelphia, Pa., Cassman & Gottlieb, of Atlantic City, N. J., and Wolf, Block, Schorr & Solis-Cohen, of Philadelphia, Pa., on the brief), for respondent.

Paul M. Salsburg, of Atlantic City, N. J., for intervener.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

Both of the instant cases come before us upon petitions of the National Labor Relations Board, filed pursuant to Section 10(e) of the National Labor Relations Act, Act of July 5, 1935, c. 372, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., to enforce two orders of the Board against the respondent, M.E. Blatt Company, dated respectively February 14, 1942, and February 26, 1943, the latter order having been amended on March 2, 1943.

The respondent owns and operates a retail department store in Atlantic City, New Jersey. Its annual purchases for the operation of its business total over $1,500,-000. It appears that approximately 95% of these purchases are made from sources outside of New Jersey. Its annual gross sales exceed $2,000,000, but merchandise of a value of only about $16,000 is shipped annually to customers outside New Jersey. The respondent contends that it is not subject to the Act because whatever goods are shipped to it for retail sale come to "complete rest" and cease being in the stream of interstate commerce upon delivery to it. We dealt with a substantially similar contention in National Labor Relations Board v. Poultrymen's Service Corporation, 138 F.2d 204,[1] and found it to be without merit. We adhere now to this ruling.

The first proceeding brought by the Board in point of time is that at our No. 8493 (Board Case No. C-1995). The second in point of time is that at our No. 8494 (Board Case No. C-2371). Before dealing with the provisions of the Board's orders in the respective cases it is neces-sary to state the background of facts in order that the contentions of the parties may be clear.

The respondent employs about three hundred persons at its store. In December, 1940, William Abramoff, the president and business agent of Retail Clerks International Protective Association, Local No. 1358, affiliated with the American Federation of Labor, began an attempt to organize the respondent's employees for his Union. A meeting was held on December 5, 1940, and was attended by only two employees, one of whom was Michael Flanagan an employee in the respondent's receiving department. Another meeting was held on December 7, 1940, and this was attended by eight or ten employees including Dorothy A. Reitzler, Marion Hempel, Charles J. Mooney and Anna Eckman. Flanagan was made chairman of the union organizing committee. He testified that shortly thereafter, about December 10th, Aaron Rosenberg, the respondent's superintendent, questioned him in respect to his membership in the Union and attendance at its meetings. Flanagan stated that Rosenberg asked him what it would get him to join the Union. It appears that Rosenberg later interrogated Flanagan again in respect to his union activities; that a supervisory employee, Joseph Alkazin, also asked both Flanagan and Mooney about their connections with the Union.

The evidence discloses that about December 18, 1940, Abramoff and the business agent of the Union had a meeting with Rosenberg and Barney Silberman, the respondent's secretary-comptroller, for the purpose of opening negotiations looking to collective bargaining. There is testimony to the effect that Silberman took the position that the respondent was not subject to the provisions of the National Labor Relations Act and demanded that he be informed as to the Union's right to represent the employees, asking to see application cards signed by the respondent's employees; that Abramoff refused to display the cards to Silberman or Rosenberg but offered to submit them for inspection to a representative of the National Labor Relations Board. Abramoff also testified that the company representatives at the meeting informed him that they would consult their

---

[1] See also the decisions of this court in National Labor Relations Board v. Kudile, 3 Cir., 130 F.2d 615, certiorari denied 317 U.S. 694, 63 S.Ct. 436, 87 L.Ed. 555, and in National Labor Relations Board v. Suburban Lumber Co., 3 Cir., 121 F.2d 829, certiorari denied 314 U.S. 693, 62 S.Ct. 364, 86 L.Ed. 554.

counsel and would let them know what the company would do. Another meeting of the Union was held on December 20, 1940. Shortly thereafter, on December 24th, the respondent discharged Flanagan, Young, Eckman, Mooney and Hempel, all active members of the Union and regular employees of the company. These five persons, together with Reitzler and two other persons constituted the entire membership of the Union at that time. Reitzler was dischargd on January 2, 1941. On December 26, 1940, Abramoff telephoned Rosenberg for the purpose of making an appointment to discuss the discharges. Rosenberg informed Abramoff that he would consult his attorney and then call him, but Abramoff did not hear from Rosenberg. Abramoff also attempted to get in communication with Max E. Blatt, the respondent's president, but without success. Later he again telephoned Rosenberg and requested a meeting. The evidence shows that Rosenberg refused to meet any representative of the Union and also refused to discuss the discharges. The Union then established a picket line at the respondent's store which it maintained for about two weeks. A proceeding was instituted before the Board at its No. C-1995. A hearing was held, findings were made and an order was entered by the Board.

■ There is ample evidence to support the findings of the Board that the dismissals occurred because of the discharged employees' union activities. Indeed, though the respondent does not expressly admit this, it now seems tacitly to concede this fact. We deem it unnecessary to discuss the evidence upon which the Board's conclusions in this regard were based.

The Board in its proceeding at C-1995 found the union to be a labor organization within the meaning of Section 2(5) of the Act, 29 U.S.C.A. § 152(5); that the respondent had discriminated in regard to the hire and tenure of employment of Flanagan, Young, Mooney, Eckman and Reitzler,[2] thereby discouraging membership in the Union, and that the respondent had engaged and was engaging in unfair labor practices by discouraging membership in the Union, and by interfering with, restraining and coercing its employees in violation of Sections 7, 8(1) and (3) of the Act, 29 U.S.C.A. §§ 157 and 158 (1) and (3).[3]

The Board ordered the respondent to cease from discouraging membership in the Union or any other labor organization of its employees' own choosing and from restraining or coercing its employees in the exercise of their right to self-organization for collective bargaining. It required the respondent to offer reinstatement to and to make whole Flanagan, Young, Mooney, Eckman and Reitzler, and to post in conspicuous places throughout its store a notice in the usual form stating that the respondent would not engage in the conduct from which it was ordered to desist, that it would take the affirmative action required by the order, that its employees were free to become or remain members of the Union, and that it would not discriminate against any employee because of membership in or activity on behalf of the Union.

The Board concedes that the respondent has complied with the provisions of the order relating to reinstatement of the discharged employees and that these employees have been made whole. The Board agrees further that the respondent on March 18, 1942 posted a notice which upon its face was a substantial compliance with the terms of the order. It complains, however, that the respondent posted simultaneously with the notice required by the Board a notice which is set out below.[4] It is the Board's contention that

---

[2] The Board expressed itself as not being satisfied that Hempel's discharge had been due to union activities rather than inefficiency. There was substantial evidence that Hempel was inefficient. The Board stated, " * * * we are not satisfied, in view of her failure to testify, that she was discharged for reasons other than inefficiency. We find accordingly that the respondent did not discharge Hempel because of her membership and activity in the union."

[3] The Board also found that the unfair labor practices of the respondent affected commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6) and (7).

[4] "To the Employees of the Company "Due to recent rulings regarding the National Labor Relations Act, employees may be approached by representatives of one or more labor organizations to solicit their membership. Under these circumstances, we feel that our employees have a right to a statement of our attitude with reference to this matter.

"We recognize the right of every em-

this second notice was plainly intended to counteract the force of the first and against the background of the respondent's actions constituted an unfair labor practice. We will deal more specifically with this notice and the parties' contentions in respect to it at a later point in this opinion.

On March 26th, after the reinstatement of Reitzler and Mooney,[5] Abramoff tried to reorganize the Union. He called a meeting of the union membership to be held on March 26th at Moose Hall at Atlantic City. Pamphlets were distributed to advertise this meeting. It was attended by about twenty-five of the respondent's employees. Abramoff testified that most of the employees present signed membership applications. Union buttons were distributed. Another meeting was held on March 31st. Approximately seventy employees attended it and Abramoff testified that most of them signed applications. Buttons were again distributed and some employees wore these into the store. A membership drive for the Union was conducted in the store, both on and off the respondent's time but always over its objections. The record contains numerous instances in which the respondent's supervisory employees or department heads endeavored to discourage this membership drive. Sue Witsky, a secretary-stenographer, who had been employed by the respondent for about four years and who had obtained signed membership applications, testified that she was reprimanded by her immediate employer, was excused for a week from any duties which would take her into parts of the store outside of her own department and was instructed by her immediate superior to report to him whenever she wished to leave the area of the department. Bessie Chazin, another employee who was active in the attempt to get employees to join the Union, testified that a department head, Mary Price, said to her, when she, Chazin, came into the neckwear department to talk to another employee before nine o'clock in the morning,[6] "You get around here quickly." and forthwith ordered her out of that department. Chazin testified that she reported this to the respondent's personnel director and was told by her that " * * * we are stopping the girls from discussing the union in the store." There were various other instances of apparently concerted attempts by the respondent's department heads and supervisory employees to prevent conversations respecting the Union by known union members with other employees during the period immediately following March 26th.

At about this time, apparently during the week commencing March, 30 1942, another labor organization, called Organized Workers' Association of the M. E. Blatt Company, appeared on the scene. It should be observed that in the eight days from April 2nd to April 9th, inclusive, the Association acquired a membership of more than two hundred out of the three hundred employees of the store. No circulars were issued to the employees but notice of the first meeting of the Association apparently was spread by word of mouth, through the store. About two hundred and fifty of the respondent's employees attended this meeting including one who had at least some supervisory duties. We think the record fully justified the Board's conclusion that while department and supervisory employees of the respondent discouraged conversation about the Union as well as attempts to induce employees to join it, no similar handicaps were imposed on efforts to recruit members for the Association.

On the day following the Association's

ploye to join any union that he may wish to join, and such membership will not affect his position with the company. On the other hand, we feel that it should be made equally clear to each employee that it is not at all necessary for him to join any labor organization, despite anything he may be told to the contrary. Certainly there is no law which requires, or is intended to compel, you to pay dues to any organization.

"For the last twenty-five years this company and its employees have enjoyed a happy relationship of mutual confidence and understanding with each other. Employees may continue to deal directly with us or with the head of their respective department as they have in the past regarding matters affecting their interests. We believe that our interests in this business are mutual and can best be promoted through confidence and cooperation.

"M. E. Blatt Company."

[5] The employees named were reinstated shortly before March 26, 1942. The exact date (or dates) is not clear from the record.

[6] The store's employees reported at 8:45 A. M. but were not required to be in their respective departments until 9 A. M.

first meeting, that is to say, on April 3rd, the respondent posted another notice which is set out below.[7] Silberman testified that this notice was intended to assure employees that if they did not join the Union at that time they would not be forced to pay an exorbitant initiation fee at a later date.[8] It should be noted also that on Saturday, April 4th (the day before Easter and a busy day for any retail or department store) and on Easter Monday the Association's membership campaign went on apparently with intense activity on the respondent's time and property and without apparent objection by the respondent.

Russell Cohen, Mabel Reger and Elizabeth Creighton, among other of respondent's employees, joined actively in the campaign to recruit members for the Association without rebuke by the management. Creighton was an assistant to Mary Price, who was the supervisor of at least eight departments on the first floor. Creighton possessed the authority to transfer employees from department to department, to sign credits, and shopping passes and to inform her superiors of the misbehavior of subordinates. Cohen was in charge of the marking room in the receiving department. Reger had direct charge of eight or nine girls in the auditing department. There is evidence to the effect that Creighton told Dorothea Watts, an employee subject to her supervision, that she was surprised because she [Watts] was "* * * the only girl in * * * [the] department" who belonged to the Union and that all the other girls were joining the Association. There is also testimony to the effect that Creighton told Reger in the presence of an employee, "When I get through talking to * * * [certain employees] there will be two members less for the AFL."[9] Indeed, the evidence shows that the activities of supervisory employees in aid of the Association were not sporadic, but were consistent and concerted.[10]

When a certificate of incorporation was executed for the Association, one of the incorporators was a supervisor; that supervisor and another were subsequently elected vice-president and recording secretary of the Association and became ex officio members of its board of directors empowered under its constitution and by-laws to enter into negotiations respecting labor relations with the respondent.

The intervening Association upon its brief and in its argument has steadfastly maintained that it was not dominated, interfered with or supported in any way by the respondent. Its assertions in this respect have been ably presented, but the weight of the evidence, the inferences to be drawn therefrom and the credibility of witnesses are questions which the Board must resolve under the Act. This is so well settled as to require no citation of authority. The Board's conclusions that the respondent dominated and interfered with the formation and administration of the Association, are supported by substantial evidence. While its conclusions in this respect turn in part upon other findings as to who were supervisory employees or department heads, these findings are equally well supported by the evidence.[11]

---

[7] "To Our Employees

"It has come to our attention that a group of our employees have met to form an organization for the purpose of collective bargaining and we wish to repeat that it is not necessary for any employee to join any organization or to pay dues to any organization in order to continue in our employ.

"M. E. Blatt Co."

[8] Silberman testified, B. A. p. 202,

"Q. What was the occasion which caused you to post that notice?—A. In my travels through the store I had heard in ever so many different parts of the store of various threats that some of our employees were receiving, as to whether to join a certain union known as the A.F. of L. at that particular time, or if they waited later they would have to be forced to pay an exorbitant initiation fee, so after I overheard several of those I thought it was my duty as an officer of the company to post this notice on our bulletin board informing our employees as to the feelings and intentions of the company, which was similar to the previous notice we had posted on March 18."

[9] See B.A. p. 185.

[10] Compare the facts in such cases as National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 83 L.Ed. 682; Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85 and National Labor Relations Board v. Sun Shipbuilding & Dry Dock Co., 3 Cir., 135 F. 2d 15.

[11] The intervener points out that the conclusions of the trial examiner in respect to these issues were overruled by the Board. The determination of the

This court has had occasion to note that the economic positions of employees frequently are such as to render them peculiarly "sensitive and responsive" to the preferences of their employer. National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 722. The situation presented by the facts of the case at bar is one of "Known hostility to one union and clear discrimination against it" which the Supreme Court in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 78, 61 S. Ct. 83, 88, 85 L.Ed. 50, held may "* * * make seemingly trivial intimations of preference for another union powerful assistance for it." The distinction strongly in favor of the Board's position between the facts of the case just cited and those of the case at bar is demonstrated by the circumstance that the preference of the respondent for the Association was not conveyed to the employees by trivial intimations but by strong and decisive actions.

A very important issue remains for disposition, however. What was the effect of the notices, set out in notes 4 and 7 supra; the first having been posted by the respondent contemporaneously with that which the Board required by its order of February 14, 1942,[12] the second, on April 3rd? The Board contends that by the notice first referred to in this paragraph the respondent deliberately counteracted the force of the notice posted by it in compliance with the Board's order. The Board has found that the text of the first notice "* * * in unambiguous terms called upon the employees to continue to deal directly with the respondent in the future, as they had for 25 years in the past, without the intervention of labor organizations, and clearly implied that such intervention would constitute the antithesis of a relationship based upon mutual confidence and co-operation between the respondent and its employees. Issued at a time when the Union was seeking to organize the employees, the notice constituted a campaign appeal by the respondent directed toward defeating the efforts of the Union." The Board concluded also that the respondent's emphasis in the notice upon direct dealing and the continuation of a past "happy relationship" in which the employees had been represented by no

labor organization nullified the respondent's position of recognition of the right of its employees to organize. The Board stated, "In the context of all the circumstances set forth, this notice marked the respondent as a partisan candidate for the allegiance of the employees in opposition to the Union, and constituted a deliberated and forceful effort by the respondent to discourage its employees from membership and activity in the Union. We find as did the Trial Examiner, that by posting such a notice the respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." In respect to the notice of April 3rd the Board stated, "Nor can the posting of the April 3 notice absolve the respondent from liability for the situation brought about by its hostility to the Union, its disparate treatment of the two organizations, and the participation of supervisory employees in the formation of the Association. It may be noted, moreover, that while this notice repeated the statement of the earlier notice, that no employee need join any organization in order to continue in the respondent's employ, it did not, like the earlier notice, carry the additional admonition that the respondent preferred to have its employees deal directly with it, rather than through any labor organization."

The effect of what has been said or published can never be appreciated except by consideration of the circumstances attendant upon speech or publication. As we have pointed out, at the time the notice accompanying the notice required by the Board's order was posted the Union had commenced or was about to commence its membership drive and the hostility which the respondent had demonstrated toward the Union was well known to the respondent's employees. The notice of April 3rd was in fact directed against the Union for Silberman, who caused it to be posted, made plain that it was intended to be so directed. See note 8 supra. But the respondent takes the position that even if it be assumed that both notices were intended to discourage membership in the Union by express words, the respondent none the less had the right to so address its employees in pursuit of its right of freedom of speech guaranteed by the First Amendment. The respondent cites in sup-

Board is conclusive. The trial examiner's report is purely advisory.

[12] In the proceedings at the Board's No. C-1995, our No. 8493.

port of its position the decision of the Supreme Court in National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct.° 344, 86 L.Ed. 348, and that of the Circuit Court of Appeals for the Second Circuit in National Labor Relations Board v. American Tube Bending Co., 134 F.2d 993, 146 A.L.R. 1017, certiorari denied 320 U.S. 768, 64 S.Ct. 84.

In the case first cited the Board had found that a certain bulletin and certain speeches made on behalf of the employer by its president to its employees amounted to coercion of its employees in respect to their choice of a bargaining representative. The Supreme Court stated in its opinion that the employer expressly urged the point that such a finding was repugnant to the First Amendment and also asserted that the Act does not enjoin the employer from expressing its views on labor policies or problems and does not impose a penalty upon it because of any utterances which it has made. Mr. Justice Murphy said, 314 U.S. at page 477, 62 S.Ct. at page 348, 86 L.Ed. 348: "The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But certainly conduct, though evidenced in part by speech, may amount, in connection with other circumstances, to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways. For 'Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.' International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 78, 61 S.Ct. 83, 87, 88, 85 L.Ed. 50." Mr. Justice Murphy went on to say, however, that it was not clear from the Board's decision whether the Board "considered the whole complex of activities, of which the bulletin and speeches are but parts, in reaching its ultimate conclusion * * *", that it did not appear that the Board raised the employer's utterances "to the stature of coercion by reliance on the surrounding circumstances"; and that if the utterances were separated from their back-

ground it was difficult "to sustain a finding of coercion with respect to them alone". In conclusion Mr. Justice Murphy stated that it was not sufficiently clear from the findings of the Board whether it based its conclusion in respect to the status of an alleged company-dominated union on the whole course of the respondent's conduct revealed by the record, concluding that the Board rested heavily upon findings with regard to the bulletin and the speeches, "the adequacy of which were to be regarded as doubtful". Accordingly the cause was remanded to the Board for redetermination of the issues.

In National Labor Relations Board v. American Tube Bending Co., supra, the Court of Appeals for the Second Circuit distinguished between communications made by an employer to his employees expressing the employer's own views in regard to the employees' selection of a bargaining agency, communications which might indicate that the employees might join a labor organization of their own choosing without fear of reprisal by the employer, and other communications by the employer to his employees which might indicate the contrary. But referring to the Virginia Electric & Power Co. case Judge Learned Hand pointed out that the employer had specifically claimed the privilege of freedom of speech guaranteed by the First Amendment. He concluded, therefore, that the Supreme Court in the Virginia Electric & Power Co. case had sustained that privilege as absolute.

We do not so construe the Supreme Court's decision. We are of the opinion that the Supreme Court intended to indicate and did indicate that communications from the employer to the employee might amount to coercion, but that it was not clear that the Board had found the existence of coercion on sufficient evidence in the cited case. The guaranty of freedom of speech contained in the First Amendment does not guarantee him who speaks immunity from the legal consequences of his verbal actions. This is the substance of our ruling in National Labor Relations Board v. New Era Die Co., 118 F.2d 500, 505. We reiterated it in the recent contempt proceeding of Edward G. Budd Manufacturing Co. v. National Labor Relations Board, 142 F.2d 922. We conclude therefore that the respondent may not successfully assert the privilege in respect to the notices objected to for the

reasons stated immediately hereinafter and we think that the decision of the Supreme Court in the Virginia Electric & Power Co. case does not impel a contrary result. Our conclusion is supported by the decision of the Supreme Court in the same case after remand to the Board and after the Board had considered the communications of the employer to the employees as a part of the completed pattern of the employer's unfair labor practices. See Virginia Electric & P. Co. v. National Labor Relations Board, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.

The Board concluded, and we have quoted its language in this regard, that the notice posted at the same time as that required by the Board, restrained and coerced the respondent's employees in the exercise of the rights guaranteed to them by Section 7 of the Act. We think that the contents of this notice, standing alone, cannot be deemed to constitute such an interference with, such a restraint or coercion of the respondent's employees in the exercase of the rights guaranteed to them by the Act as to constitute an unfair labor practice. But the contents of the notice must be considered in conjunction with that posted on April 3rd and other facts completing the pattern of the respondent's conduct toward the Association and the Union. We consider the notice of April 3rd to be objectionable in itself, and particularly so when it is considered in the light of the contents of the earlier notice objected to and the respondent's other acts in furtherance of the Association and in hindrance of the organization of the Union. The Board treats the notice of April 3rd as if it were an act of attempted absolution by the respondent. It was not such, but was an affirmative act of the respondent in its offensive against the Union. It will be noted that the notice was phrased in the negative and stated that "it is not necessary" for any of the respondent's employees to join a union in order to remain in the respondent's employ. The notice made no reference to the very pertinent fact that the respondent's employees might join a labor organization and still remain in the respondent's employ. Contrast the language of the notice objected to by the Board which states inter alia: "We recognize the right of every employee to join any union that he may wish to join, and such membership will not affect his position with the company."

■ Upon reviewing the whole of the record, including the notices and the other acts of the respondent, constituting the completed pattern of the respondent's conduct, we hold that the conclusions of the Board that the respondent has engaged in unfair labor practices within the meaning of Section 8(1) and (2), 29 U.S.C.A. § 158(1) and (2), and that these practices affect commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C. A. § 152(6) and (7), are supported by the evidence and are legally correct.

As we have already indicated, the Board has asked us to enforce its order at its No. C-1995, our No. 8493, except as to those portions thereof which relate to the reinstatement and to the making whole of the discharged employees designated in the Board's opinion as well as its order as amended at its No. C-2371, our No. 8494. As to those portions of both orders requiring the posting of notices, the Board states upon its brief: "It will, however, be sufficient compliance with the orders * * * for respondent to post combined notices covering the respective notice provisions in 8493 and 8494." Obviously this is the case and our decree will so provide.

In view of the settled practice of this court,[13] the order before us at No. 8493 will be amended by inserting after the word "Labor" (first occurrence) in paragraph 2(c) (3) the words "or any other labor organization of their choice."

A decree enforcing the orders of the Board, with the modifications indicated will be entered when presented in accordance with our Rule 20(10).

[13] See National Labor Relations Board v. Weirton Steel Co., 3 Cir., 135 F.2d 494, 499.