**NATIONAL LABOR RELATIONS BOARD v. PUBLIC SERVICE CO-ORDINATED TRANSPORT et al. (AMALGAMATED ASS'N OF STREET, ELECTRIC RY. & MOTOR COACH EMPLOYEES OF AMERICA, A.F.L., Divisions 819–825, 862, 880, 947, Intervenor).**

No. 9891.

United States Court of Appeals Third Circuit.

Argued April 19, 1949.

Decided Sept. 6, 1949.

Rehearing Granted Dec. 27, 1949.

Submitted Jan. 20, 1950.

Opinion Filed Jan. 24, 1950.

A. Norman Somers, Washington, D. C. (David P. Findling, Associate General Counsel, Frederick U. Reel, Irving M. Herman, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Raymond Schroeder, Newark, N. J., for respondents.

M. Herbert Syme, Philadelphia, Pa. (O. David Zimring, Chicago, Ill., on the brief), for intervenor.

Before BIGGS, Chief Judge, and McLAUGHLIN and O'CONNELL, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order against respondents following a proceeding under Section 10 of the National Labor Relations Act, 49 Stat. 449, 29 U.S. C.A. § 160.

Respondents operate and maintain a completely integrated system of public passenger transportation effective throughout the state of New Jersey. Public Service Interstate Transportation Company conceded at the hearing that it is engaged in interstate commerce. Public Service Co-ordinated Transport was found by the Trial Examiner, upon substantial evidence, to be engaged in interstate commerce within the meaning of the Act and that finding was affirmed by the Board. The unions involved are Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, affiliated with the American Federation of Labor, and United Transport Workers of America, unaffiliated. Amalgamated, an intervenor here, has maintained contractual relations with the respondents and their predecessors for twenty-seven years. United was incorporated February 26, 1946, and held its first meeting March 10, 1946. It was organized by Sconfienza and a small group of former members of Amalgamated most of whom at least had participated in an unauthorized strike against respondents on November 18, 1942.

The Board's decision and order found that respondents had violated Section 8(1) of the Act, 29 U.S.C.A. § 158(1); namely, that they had interfered with, restrained or coerced employees in the exercise of the rights guaranteed in Section 7 of the Act,

29 U.S.C.A. § 157.[1]  This was based on certain acts of respondents' employees, Messrs. Belknap, Modersohn and Dick. The Board also upheld the Trial Examiner in his finding that the respondents had discriminated against their employee, Frederick C. Sconfienza, by suspending him from employment. The Board held that respondents by so doing had violated Section 8(3) and Section 8(1) of the Act. The Board ordered that the respondents cease and desist from discouraging membership in the United or any other labor organization of their employees, or encouraging membership in the Amalgamated; that Sconfienza be offered reinstatement with reimbursement of lost pay and that copies of the notice attached to the order be posted throughout respondents' transportation system in the State of New Jersey.

### The Belknap, Modersohn and Dick Activities.

On March 19, 1946, Belknap was assistant depot master at respondents' Englewood garage. The Trial Examiner found that some time that evening, Holden and Altana, two men connected with United, appeared at the garage to interview a bus cleaner and solicit his membership in United. Altana entered the garage and was ordered off the premises by Belknap. Altana and Holden, in testimony accepted by the Trial Examiner, say that following this they saw Belknap in the operating room talking to several individuals who were apparently cleaners employed at the garage. They say the door to the room was closed and that a glass panel of the door was painted completely black. There was, however, according to them, a sizable chip in the paint and it was through this that Altana made observations. Holden said he was able to see through a window. Also, as the Trial Examiner paraphrases their testimony, they say the transom over the door was open and they heard Belknap advise the men in the room "that they should not join 'another' organization, that he had known Arthur Seward [Amalgamated business agent] for a long time, that Seward was a good man and that the employees would be well off in sticking with the union to which they belonged." Altana said Belknap concluded by stating, "If any of you fellows get caught talking to that fellow you might lose your job."

In examining this and the other two occurrences involved we appreciate of course "that it is the province of the Board as the fact-finder to resolve the conflicts in the testimony and to appraise the credibility of the witnesses." N. L. R. B. v. Sun Shipbuilding & Dry Dock Co., 3 Cir., 135 F.2d 15, 25. The present problem goes beyond that. It is whether the three incidents amount to substantial evidence of respondents' violation of Section 8(1).

Belknap, formerly a bus driver, had advanced to what seems to be a step beyond that rank. He was at the lowest of the supervisory group but was not actually himself a supervisor. He assisted the depot master in the receipt of the bus operators' monies and in various other clerical functions. The only persons identified as having talked with him were Foster and Shaver, both of whom were cleaners and fuel men. Foster testified that his boss was a foreman named Jesson and that Belknap did not give him any orders. Foster was in the bus operators' room to get away from Altana whom he did not wish to see, because he was satisfied with Amalgamated. Belknap said he believed Shaver was in the room for the same reason, and this was not contradicted. Shaver was not a witness. Belknap said what happened was that after Foster had told him Altana was in the garage, he went out and ordered Altana off respondents' property. On his return, after Foster had stated that he was satisfied with Amalgamated, Belknap said, "I don't blame you. As far as I am concerned, I have belonged to unions for a good many years and I have never belonged

1. Section 7 of the Act reads: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection."

to any of them that worked harder for their men than Artie Seward."

Accepting, as we do, the Board's interpretation of the episode, we cannot see that interference, restraint or coercion by the employer is fairly inferable or that it "had the slightest effect in actually preventing or discouraging membership" in the United. Quaker State Oil Refining Corp. v. N. L. R. B., 3 Cir., 119 F.2d 631, 633. See also Humble Oil & Refining Co. v. N. L. R. B., 5 Cir., 113 F.2d 85, 92.

The remaining incidents are, if anything, more trivial. In the first of these, the Board found that Supervisor Modersohn unlawfully interfered with Altana's activities on behalf of Amalgamated at respondents' Englewood garage on March 21, 1946. At that time Modersohn was told by Altana that his continued presence at the garage, where he could be seen by the employees, would operate to prevent the signing up of any of the men. Modersohn replied that he had intended to leave, but in view of Altana's protest he would stay a while just for spite. We are unable to infer from this any substantial evidence to support the Trial Examiners' finding that, "Modersohn's statement that he intended 'to stick around' in the light of all the circumstances, clearly represents an effort to achieve the objective protested by Altana". We think rather that Modersohn's reaction showed a natural resentment on his part— the reluctance of a supervisor to submit to being ordered away from the vicinity of his employer's garage by a former employee who was there attempting organizational work for the United. The circumstance is isolated. It is not flagrant. It does not "indicate a purpose to interfere with the exclusive right of the employees to engage in organizational activities for the purpose of collective bargaining, as guaranteed by the Act." N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179, 181, certiorari denied, William Davies Co. v. N. L. R. B., 320 U.S. 770, 64 S.Ct. 82, 88 L.Ed. 460.

The last item on this branch of the case took place on March 23, 1946 during a visit by Altana and Holden to respondents' Hackensack garage. According to Holden, on whose testimony the Trial Examiner relied, Altana started to talk to a group of respondents' employees who were at the rear of the garage on their lunch period. Holden said that while this was going on, garage foreman Dick, Seward and the supervisor of the Hackensack garage, were standing in back of an open doorway about five or six feet from Altana. Holden stated, "It looked as though they were just walking through the doorway." Holden said the lunch hour was from 12:00 to 12:30, but that the usual whistle was not blown at 12:30. He said he checked a second time to see if the three men were still back of the door, and they were. The Trial Examiner concluded "that Altana and the employees were permitted to remain in ignorance of the fact that solicitation of the latter had extended into working time." The Board found that the incident constituted "unlawful surveillance by garage foreman Dick of the organizational efforts of Altana among garage mechanics * *." Dick explained the delay in the blowing of the whistle by the fact that both he and his assistant foreman, whose duty it was to blow the whistle, had been busy with a New Jersey Public Utility Commission inspector up until about 12:40 and that when he came into the garage at that time and found the men had not returned to work he himself "* * * blew the whistle and started walking out to the room where the men generally eat their lunch."[2] Holden did not hear what Altana told the garage employees on this occasion and it is to be noted that Altana, though a witness, did not testify regarding this particular matter at all.

We agree that "Any real surveillance by the employer over the Union activities of employees, whether frankly open or carefully concealed, falls under the prohibitions of the Act." N. L. R. B. v. Collins & Aikman Corporation, 4 Cir., 146 F.2d 454, 455. In N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, 50, we said:

2. It is admitted that the Public Utilities Commission inspector referred to died prior to the Labor Board hearing in this matter.

"* * * the use of detectives as labor spies to report on 'outside' union activities of employees justified an inference of company support of existing 'inside' unions and interference with the employees' freedom of choice. (Citing cases.) This is so even in the absence of a showing that specific use was made of the information so obtained or that the employees were aware that they were being or had been spied upon." We fail to find substantial evidence of any true surveillance in this instance. Under Holden's testimony at its credited value, while Altana was making his open solicitation, Dick was within the garage where he had every right and duty to be. He may or may not have heard what Altana said. We have no evidence as to what Altana did say. He does not tell about it and Holden does not know. In addition, there is no evidence that Dick made observations as to who was at the gathering or regarding specific reactions of individuals. There is not the slightest inference of any results arising out of Dick's presence. Assuming that Dick, within the garage, had his attention attracted by Altana's talk to the men at the rear of the garage and that he listened to it and that he blew the whistle ten minutes late, the sum total of these details does not add up to the surveillance prohibited by the Act. This was no secret meeting of employees. Altana would seem to have expected Dick's presence, for according to Holden, when he told Altana that Dick might be able to hear what he said, Altana replied, "That is fine. I will keep right on talking."

Nor do we think that the Belknap, Modersohn and Dick situations, such as they were, are to be attributed to the employer. The record shows twenty-seven years of peaceful labor relations between respondents and their employees. The one interruption of that peace was the unauthorized strike above mentioned in which Altana, Holden and Sconfienza were prominent. Against that background the Board holds the respondents responsible for: (1) The casual comments made by Belknap to two employees (over one of whom he definitely had no authority whatsoever); (2) The stubborn refusal of Modersohn to permit an ex-employee of respondents to humiliate him by driving him away from respondents' Englewood garage; and (3) The fact that Dick, at the respondents' garage where he was in charge, may have heard Altana's open solicitation to the garage employees which was apparently just what Altana expected and desired. We do not see that these activities could have been reasonably assumed by employees to have been management inspired and there is no proof tending to show that they were actually so regarded. They are minor, unrelated acts which fail to reveal either employer pattern of conduct as in N. L. R. B. v. M. E. Blatt Co., 3 Cir., 143 F.2d 268, or the totality of company activities called for by N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348. In our judgment they did not constitute interference, restraint and coercion within the meaning of the Act on the part of the respondents. Quaker State Oil Refining Corp. v. N. L. R. B., supra; N. L. R. B. v. Whittier Mills, 5 Cir., 111 F.2d 474; Martel Mills Corporation v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Sun Shipbuilding & Dry Dock Co., supra; N. L. R. B. v. Shenandoah-Dives Mining Co., 10 Cir., 145 F.2d 542, 547.

### The Suspension of Sconfienza.

Sconfienza was suspended from Amalgamated April 24, 1946. One of the reasons for this was his dual unionism. Thereafter, Amalgamated under its contract with respondents, demanded Sconfienza's suspension and respondents complied with that demand. Respondents assert that there was no substantial evidence to justify the Board's finding that they knew Amalgamated had suspended Sconfienza, among other things, for activities on behalf of the United. The record does not bear out that contention. The president of the Amalgamated on cross examination testified that when he delivered Amalgamated's letter to respondents advising of Sconfienza's union suspension and demanding that respondents in turn suspend him from work, he told respondents' general manager that Sconfienza had been suspended for three reasons, one of which was "dual unionism."

It is assumed by the Board in its decision that in accordance with the proviso to Sec-

tion 8(3) of the Act,[3] the contract between respondents and Amalgamated in effect at the time of Sconfienza's suspension required the respondents to terminate the employment of an employee suspended from membership in good standing in the Amalgamated. However, the Board went on to hold that because of the factual situation the contract did "not protect the respondents in the suspension of Sconfienza under the principles enunciated in the Rutland Court case and related decisions of the Board."

The Rutland Court doctrine was adopted by the Board in order to secure for employees an opportunity at an appropriate time to exercise their right to "change their collective bargaining representative for the next contractual period" and to "affiliate with and campaign for any union for the next period." Matter of Rutland Court Owners, 44 N. L. R. B., 587, 594, 596. Same case supplemental decision, 46 N. L. R. B. 1040; N. L. R. B. v. American White Cross Laboratories, Inc., 2 Cir., 160 F.2d 75; N. L. R. B. v. Geraldine Novelty Co., Inc., 2 Cir., 173 F.2d 14; Local No. 2880 etc., v. N. L. R. B., 9 Cir., 158 F.2d 365, certiorari granted 331 U.S. 798, 67 S.Ct. 1305, 91 L.Ed. 1824; certiorari dismissed on motion of petitioner, 332 U.S. 845, 68 S.Ct. 347, 92 L.Ed. 416; Colgate-Palmolive-Peet Co. v. N. L. R. B., 9 Cir., 171 F.2d 956, certiorari granted 337 U.S. 913, 69 S.Ct. 1155. Cf. Wallace Corp. v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216. Contra Aluminum Co. of America v. N. L. R. B., 7 Cir., 159 F.2d 523, 526.

We think the Rutland Court rule is sound labor law and approve of it. We agree with respondents that the doctrine does not apply where the employees' activities were not primarily designed to change their bargaining representative for the next contractual period. Matter of Rutland Court Owners, Inc., supra; Matter of Southwestern Portland Cement Co., 65 N. L. R. B. 1, 7, 8. Respondents urge that the record clearly establishes this, and that Sconfienza did not at any time advise the employees he was soliciting to the contrary. If this was the fact, Sconfienza would not have been protected under the Rutland Court doctrine and respondents would have been justified in suspending him in accordance with the demand of their closed shop employees' bargaining agent.

There is strong support in the record for respondents' position. Sconfienza testified that he had distributed authorization cards for United. As to the employees he solicited he said, "I showed them the card. Let them read it over well which, in the meaning itself, I took to mean they would be joining a new union other than the Amalgamated which they belonged to." The form of authorization card is in evidence. It provides a place for the insertion of the date of signing and authorizes United to represent the signer in all collective bargaining with the company. It concludes with the language: "This authorization supersedes and cancels all other previous authorization made by me." There is nothing about the card to show that there was any intention to confine the authorization to the quest of a new bargaining agent to replace Amalgamated after expiration of the current employment contract which was to conclude July 1, 1946. Nor did the card contain any indication that immediate action within the period of the existing agreement was not contemplated which action might well have undermined the status of the existing bargaining representative as in the Southwestern Cement case, supra, and as in the 1942 wildcat strike of respondents' employees in which Sconfienza had been a leader.

---

3. The proviso to Section 8(3) of the Act reads: "Provided, That nothing in this Act, or in the National Industrial Recovery Act (U.S.C., Supp. VII, title 15, secs. 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective bargaining unit covered by such agreement when made." 49 Stat. 452.

After the above evidence had been received and just prior to the close of the testimony, Sconfienza was recalled to the stand. He was asked by counsel for the Board, "Mr. Witness, will you tell us, after you commenced to organize on behalf of the United Transport Workers of America, what was said, if anything, by you to any employee that you attempted to solicit or did solicit on behalf of that organization?" He replied, "Well, I said to the man, 'This time we have a sixty-day notification that has to go through to the company, where they tell us down in the union halls, when they are renewing contracts, that we have to get in before that sixty days and we will not in any way injure the contract by the Amalgamated, which is on the property by going into it before.' That's why we started soliciting at this time in March, at the end of the contract which would be coming up of the Amalgamated." In addition to this there was in evidence a petition for certification of representatives which had been docketed by the Board March 21, 1946. This was by United and in the usual form advising the Board that the employer (named as "Public Service Coordinated Transport Co.") had refused to recognize the petitioner as exclusive collective bargaining agent for the "Bus Drivers—Garage Men and Maintenance Men of Bergen County, New Jersey." It asked the Board to investigate the controversy and "certify to the parties the name or names of the representatives designated or selected by the employees." There is a letter in evidence from the Board to Public Service Coordinated dated March 26, 1946 advising that company of the petition and of a joint conference on the matter. There is also in evidence a request by United to withdraw its petition, without prejudice. This is dated June 28, 1946 and was approved on that date by the Regional Director.[4]

The Board found that the facts revealed that Sconfienza's activities on behalf of United were "reasonably calculated to bring about a change of representatives at an appropriate time." In view of Sconfienza's testimony when he was recalled as a witness and of the filing of the petition for certification, we cannot say that there was not substantial evidence on which to base that conclusion.

Though respondents do not here argue the other phase of the Rutland Court principle, namely, whether Sconfienza's activities for United were toward the end of the current employment contract, a brief word should be said regarding it in the light of the instant facts. Sconfienza's efforts started approximately four months prior to July 1, 1946. That commencement date, standing alone, could create a serious problem as to whether the activities starting in March should be construed as taking place within a reasonable period preceding the expiration of the contract. But we do not have to pass upon that question because the agreement contained an automatic sixty day renewal clause. Such provision under the Board's decisions permits employees to engage in organizational activities during a reasonable period prior to the date of automatic renewal. Matter of Mill B, Inc., 40 N. L. R. B. 346, 348–352; Matter of Mississippi Lime Co., 71 N. L. R. B. 472, 473–475. The time of the beginning of Sconfienza's work for United is thus reduced to less than two months prior to the automatic renewal date. That period seems reasonably within the protection of the Rutland Court rule.

Respondents argue that the findings of the Trial Examiner were arbitrary. The point need not be gone into at length as it is disposed of by the recent decision of the United States Supreme Court in N. L. R. B. v. Pittsburgh Steamship Company, 337 U.S. 656, 69 S.Ct. 1283.

The order of the Board will be modified so as to be confined to ordering the respondents to cease and desist from practices similar to the Sconfienza incident. N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. As so modified, it will be enforced.

Whether the notice incorporated in the Board's order should be posted throughout respondents' transportation system in the State of New Jersey is no longer an open question in this circuit. N. L. R. B. v. T. W. Phillips Gas & Oil Co., 3 Cir., 141 F.2d 304. The notice will be so posted.

4. The petition appears to have been defective in that certification was sought by a unit which did not cover the state.

## On Rehearing

Before BIGGS, Chief Judge, and Mc-LAUGHLIN and HASTIE, Circuit Judges.

### PER CURIAM.

The remaining question involved in this petition for enforcement concerned the suspension by respondents of their employee, Frederick C. Sconfienza, at the request of the incumbent union. The union had itself previously suspended Sconfienza because of, among other things, his dual unionism. The Labor Board under the then existing Rutland Court doctrine [1] ordered Sconfienza's reinstatement and that he be made whole for any pay losses he suffered by reason of respondents' action. We agreed with the Labor Board as to this and held that "The order of the Board will be modified so as to be confined to ordering the respondents to cease and desist from practices similar to the Sconfienza incident." Our decree of December 3, 1949 enforcing the Board's order as we had modified it, called for the respondents to cease and desist from "Discouraging membership in the United Transport Workers of America, unaffiliated, or any other labor organization of their employees, by discharging or refusing to reinstate any of their employees, or by discriminating in any other manner with respect to their hire or tenure of employment or any term or condition of employment".

Respondents were ordered to offer Sconfienza reinstatement and to make him whole for any pay losses caused by his suspension. Appropriate notices were to be posted by respondents.

On December 5, 1949, the United States Supreme Court in Colgate-Palmolive-Peet Co. v. National Labor Relations Board, 70 S.Ct. 166, passed upon the same problem as was presented to us here and flatly rejected "the application of the Rutland Court doctrine". The Labor Board concedes that this "supervening decision of the Supreme Court" controls this case and the Board properly states "that in the light of that decision, the relief requested by respondents is warranted." The Board further consents to the vacating of our decree and to the setting aside of its order entered April 20, 1948.

Plainly, the Colgate decision governs the issue before us. Therefore, our decree in this case of December 3, 1949 enforcing the order of the Board as modified by us, will be vacated. The order of the Board will be set aside and the Board directed to dismiss the complaint.

---

[1] As we stated in our prior opinion in this matter, 177 F.2d 119, 123, the Board had adopted the Rutland Court doctrine "in order to secure for employees an opportunity at an appropriate time to exercise their right to 'change their collective bargaining representative for the next contractual period' and to 'affiliate with and campaign for any union for the next period.' Matter of Rutland Court Owners, 44 N.L.R.B., 587, 594, 596. Same case supplemental decision, 46 N.L.R.B. 1040;"