COLGATE-PALMOLIVE-PEET CO. *v.* NATIONAL
LABOR RELATIONS BOARD ET AL.

No. 47.   Argued November 17, 1949.—Decided December 5, 1949.

*Ricardo J. Hecht* argued the cause for petitioner. With him on the brief were *Philip S. Ehrlich* and *Bartley C. Crum.*

*Ruth Weyand* argued the cause for the National Labor Relations Board, respondent. With her on the brief were *Solicitor General Perlman, Robert N. Denham, David P. Findling, Marcel Mallet-Prevost* and *Bernard Dunau.*

*Mathew O. Tobriner* filed a brief for the International Chemical Workers Union, A. F. of L., respondent.

MR. JUSTICE MINTON delivered the opinion of the Court.

The question we have here is whether a closed-shop contract, entered into and performed in good faith, and valid in the state where made, protects an employer from a charge of unfair labor practices under the National Labor Relations Act.[1]

Petitioner was found by the National Labor Relations Board to have violated §§ 8 (1) and 8 (3) of the Act.[2] On petition for review and cross-petition of the Board for enforcement of its order, the Court of Appeals for the Ninth Circuit entered a decree enforcing the Board's order.[3] We granted certiorari limited to the question of the construction of § 8 (3) of the Act in relation to this case,[4] *i. e.,* to examine the applicability of the so-called *Rutland Court* doctrine,[5] here applied by the Board.

---

[1] 49 Stat. 449 *et seq.,* 29 U. S. C. § 151 *et seq.*

[2] *Matter of Colgate-Palmolive-Peet Company,* 70 N. L. R. B. 1202.

[3] 171 F. 2d 956.

[4] 337 U. S. 913.

[5] *Matter of Rutland Court Owners, Inc.,* 44 N. L. R. B. 587, 46 N. L. R. B. 1040.

The doctrine has been approved in the Second,[6] Third,[7] and Ninth Circuits,[8] but disapproved in the Seventh Circuit.[9]

At the period of time in question in 1945, petitioner company was engaged in producing glycerin for war purposes. Petitioner has no record of antiunion or antiorganizational activities. Its employees were first organized and represented in 1936 by a union affiliated with the American Federation of Labor. In 1938 the International Longshoremen's and Warehousemen's Union, affiliated with the Congress of Industrial Organizations, became the representative of petitioner's employees. On July 9, 1941, the C. I. O. entered into a collective bargaining contract with petitioner which contained a closed-shop provision in these words:

> "Section 3. The Employer agrees that when new employees are to be hired to do any work covered by Section One (1), they shall be hired thru the offices of the Union, provided that the Union shall be able to furnish competent workers for work required. In the event the union is unable to furnish competent workers, the Employer may hire from outside sources, provided that employees so hired shall make application for membership in the Union within fifteen (15) days of their employment. The employees covered by this agreement shall be mem-

---

[6] *Labor Board* v. *Geraldine Novelty Co.,* 173 F. 2d 14; *Colonie Fibre Co.* v. *Labor Board,* 163 F. 2d 65; *Labor Board* v. *American White Cross Laboratories,* 160 F. 2d 75.

[7] *Labor Board* v. *Public Service Transport Co.,* 177 F. 2d 119.

[8] *Labor Board* v. *Colgate-Palmolive-Peet Co.,* 171 F. 2d 956; *Local 2880* v. *Labor Board,* 158 F. 2d 365, certiorari granted, 331 U. S. 798, certiorari dismissed on motion of petitioner, 332 U. S. 845.

[9] *Aluminum Co.* v. *Labor Board,* 159 F. 2d 523; *Lewis Meier & Co.* v. *Labor Board,* 21 L. R. R. M. 2093 (Nov. 1947).

bers in good standing of the Union and the Employer shall employ no workers other than members of the Union subject to conditions herein above prescribed. In the hiring of new help (for the warehouses), they shall be hired through the offices of the Warehouse Union, Local 1–6, I. L. W. U."

This contract was entered into in good faith by the parties and served as a foundation for amicable labor relations for over four years. It was of indefinite duration. On July 24, 1945, the C. I. O. and petitioner entered into a supplemental agreement that their contract of July 9, 1941, "shall remain in full force and effect" pending approval of certain agreed-upon items, other than the closed-shop provision, by the War Labor Board. In the instant proceedings, the closed-shop contract, as extended by the supplemental agreement, was found by the National Labor Relations Board to have been made in compliance with the proviso of § 8 (3) of the Act.[10]

On July 26, 1945, shortly after the making of the supplemental agreement, open agitation for a change of bargaining representative began. On July 31 an unauthorized strike occurred which was participated in by a

---

[10] "Sec. 8. It shall be an unfair labor practice for an employer—

.        .        .        .        .

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, . . . or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."    49 Stat. 452, 29 U. S. C. § 158 (3).

substantial majority of the employees and lasted two and one-half days, although the C. I. O. had pledged its membership not to strike during wartime. A group of employees formed an independent organization which later sought to affiliate with the A. F. of L. There was much propagandizing among the employees and warnings were issued by the C. I. O. that its members would be disciplined for rival union activity, and would if disciplined be discharged from their jobs under the closed-shop contract with petitioner.

Altogether some 37 employees were suspended and expelled by the C. I. O. for their activities in behalf of the A. F. of L. union during the fight between the two unions for control, and because of their participation in the strike contrary to C. I. O. policy. These suspended and expelled employees were discharged by petitioner, with the advice of counsel, upon demand by the C. I. O. The ground of the demand was that they were no longer "members in good standing" of the C. I. O. as required by the closed-shop contract. Petitioner knew, as the Board found, that the discharge of these employees was demanded by the C. I. O. because of their rival union activity.

On October 16 the C. I. O. won an election held by the Board to determine the bargaining representative of petitioner's employees, and the open hostilities were substantially concluded.[11]

Petitioner was charged with violation of § 8 (1) and § 8 (3) of the Act and found guilty thereof by the Board for having carried out the terms of the closed-shop con-

---

[11] This election was thereafter set aside by the Board, upon objections filed by the A. F. of L., on the ground that the employer's discharge of employees at the request of the C. I. O. prevented the result of the election from being truly representative of the employees' wishes.

tract at the request of the bargaining representative. The Board ordered petitioner to restore the employees discharged at the request of the C. I. O. to their former positions without loss of seniority and pay. It is this order which the Court of Appeals decreed should be enforced and that is here for review.

There is no question but that the discharges had the effect of interfering with the employees' right, given by § 7 of the Act, to self-organization and to collective bargaining through representatives of their own choosing. Nor is there any question but that the discharges had the effect of discriminating, contrary to the prohibition of § 8 (3), in the tenure of the employees. It is petitioner's contention that such interference and discrimination are taken out of the category of unfair labor practices where the employees are discharged in good faith, pursuant to an employer's obligations under a valid closed-shop contract entered into in good faith with the authorized representative of the employees, as permitted by the proviso contained in § 8 (3) of the Act.[12] The Board admits that petitioner's contention is supported by the proviso in § 8 (3) but says that a contract of indefinite duration such as the one in the instant case is subject to the doctrine of *Rutland Court Owners, Inc.*, 44 N. L. R. B. 587, 46 N. L. R. B. 1040. In the *Rutland Court* case the Board determined that an employer is not permitted to discharge employees pursuant to a closed-shop contract, even though the contract is valid under the proviso to § 8 (3), when, to the employer's knowledge, the discharge is requested by the union for the purpose of eliminating employees who have sought to change bargaining representatives at a period when it is appropriate for the employees to seek a redetermination of representatives. The reason for this holding by the Board will be presently discussed. The

---

[12] *Supra,* n. 10.

doctrine as applied to the facts in this case is stated in the Board's brief as follows:

"The Board found the closed-shop agreement to have been validly entered into in conformity with the proviso to Section 8 (3) of the Act. The Board concluded, however, that, by virtue of the indefinite term of the contract, which had run for more than four years, the employees undertook to oust the C. I. O. as their bargaining representative at a period during which it was appropriate to seek a redetermination of representatives."

The Board contends that therefore the contract no longer protected petitioner.

We take it from this conclusion of the Board that there is no dispute as to the validity of the closed-shop contract as far as the Act is concerned. In *Algoma P. & V. Co.* v. *Wisconsin Empl. Rel. Bd.,* 336 U. S. 301, it was held that nothing in the Act precludes a state from prohibiting closed-shop contracts in whole or in part. We therefore also look to the law of the state where the closed-shop contract was made, here California, to determine its validity. We think it is clear, and do not understand the Board to contend otherwise, that the closed-shop contract was valid under California law. *Shafer* v. *Registered Pharmacists Union Local 1172,* 16 Cal. 2d 379, 106 P. 2d 403; *Park & Tilford Import Corp.* v. *International Brotherhood of Teamsters, Etc., Local 848,* 27 Cal. 2d 599, 165 P. 2d 891; *James* v. *Marinship Corp.,* 25 Cal. 2d 721, 155 P. 2d 329. In the *Marinship* case, *supra,* at 736, the California Supreme Court explicitly recognized that a union may expel persons who "have interests inimical to the union" because of "the right of the union to reject or expel persons who refuse to abide by any reasonable regulation or lawful policy adopted by the union." See also *Davis* v. *Int. Alliance of Stage Employees,* 60 Cal. App. 2d 713, 715, 141 P. 2d 486, 487–488, where it is stated that

under California law, "An organization has the natural right of self preservation, and may with propriety expel members who show their disloyalty by joining a rival organization." The contract was valid under the Act and under state law.

The claimed impotency of the contract as a defense here rests not upon any provision of the Act of Congress or of state law or the terms of the contract, but upon a policy declared by the Board. That policy has for its avowed purpose the solution of what the Board conceives to be an anomalous situation, in that § 7 guarantees employees the right to select freely their representative for collective bargaining, while the proviso to § 8 (3) permits a closed-shop contract with inherent possibilities for invasion of the right guaranteed by § 7. The solution arrived at in the *Rutland Court* case, and urged here, is that the Board may not give full effect to the proviso of § 8 (3) because to do so would permit circumvention of § 7. We turn to this contention.

One of the oldest techniques in the art of collective bargaining is the closed shop.[13] It protects the integrity of the union and provides stability to labor relations. To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act.[14] Congress knew that a closed shop would interfere with freedom of employees to organize in another union

---

[13] See Peterson, American Labor Unions, p. 1 (1945). Rev. Jerome L. Toner in The Closed Shop in the American Labor Movement, published under auspices of The Catholic University of America, Studies in Economics, vol. 5, 1941, traces the principle of the closed shop to the English guild system, the forerunner of the American union movement, p. 16 *et seq.* In America the desire of workers for closed-shop conditions antedates the American Revolution and even unionism. *Id.* at 22, 58 *et seq.*

[14] 49 Stat. 449, 29 U. S. C. § 151; S. Rep. No. 573, 74th Cong., 1st Sess. 1 (1935); H. R. Rep. Nos. 969, 972, 74th Cong., 1st Sess. 6 (1935); H. R. Rep. No. 1147, 74th Cong., 1st Sess. 8 (1935).

and would, if used, lead inevitably to discrimination in tenure of employment.[15]   Nevertheless, with full realization that there was a limitation by the proviso of § 8 (3) upon the freedom of § 7, Congress inserted the proviso of § 8 (3).   It is not necessary for us to justify the policy of Congress.   It is enough that we find it in the statute. That policy cannot be defeated by the Board's policy, which would make an unfair labor practice out of that which is authorized by the Act.   The Board cannot ignore the plain provisions of a valid contract made in accordance with the letter and the spirit of the statute and reform it to conform to the Board's idea of correct policy. To sustain the Board's contention would be to permit the Board under the guise of administration to put limitations in the statute not placed there by Congress.   In reality whatever interference or discrimination was present here came not from the employer, but from fellow-employees of the dischargees.   Shorn of embellishment, the Board's policy makes interference and discrimination by fellow-employees an unfair labor practice of the employer.   Yet the legislative history conclusively shows that Congress, by rejecting the proposed Tydings amendment to the Act, refused to word § 7 so as to hamper coercion of employees by fellow-employees.[16]   The emasculation of the contract

---

[15] See statement of Senator Wagner: Hearings before Senate Committee on Education and Labor on S. 195, 74th Cong., 1st Sess. 47 (1935); Statement of Mr. Millis, *id.* at 179–180; and the Senate and House Reports accompanying the bill: S. Rep. No. 573, 74th Cong., 1st Sess. 16 (1935); H. R. Rep. No. 1147, 74th Cong., 1st Sess. 15–17 (1935).

[16] During consideration of the bill on the Senate floor, Senator Tydings proposed to amend it by adding to § 7 the words, "free from coercion or intimidation from any source." In the debate which followed it became clear that the amendment would deal with employee-against-employee relations, while the bill was designed to deal only with employee-employer relations, and the amendment was defeated. See 79 Cong. Rec. 7653–7658, 7675.

pressed for by the Board in order to achieve that which Congress refused to enact into law cannot be sustained.

It must be remembered that this is a contest primarily between labor unions for control. It is quite reasonable to suppose that Congress thought it conducive to stability of labor relations that parties be required to live up to a valid closed-shop contract made voluntarily with the recognized bargaining representative, regardless of internal disruptions growing out of agitation for a change in bargaining representative. In the instant case the employees exercised their right to choose their bargaining representative. The representative bound them to a valid contract. The contract was lived under for four years and was subsisting at the period of time in question. It was made and carried out in good faith by petitioner, who cannot be held guilty of an unfair labor practice by administrative amendment of the statute. We reject the application of the so-called *Rutland Court* doctrine.

Nothing that this Court said in *Wallace Corp.* v. *Labor Board,* 323 U. S. 248, supports the Board's position here. In that case this Court said:

> "It was as much a deprivation of the rights of these minority employees for the company discriminatorily to discharge them in collaboration with Independent as it would have been had the company done it alone. To permit it to do so by indirection, through the medium of a 'union' of its own creation, would be to sanction a readily contrived mechanism for evasion of the Act." 323 U. S. at 256.

There the independent union was found to be a company-supported union, and the employer was found guilty of an unfair labor practice for supporting it. While the proviso to § 8 (3) permits a closed-shop contract, it does not permit one made with a union "established, maintained, or assisted by any action defined in this Act as

an unfair labor practice." So the Court concluded in the *Wallace Corp.* case that: "The Board therefore is authorized by the Act to order disestablishment of such unions and to order an employer to renounce such contracts." 323 U. S. at 251. Thus the *Wallace Corp.* case does not deal with the scope of protection afforded an employer by a valid closed-shop contract, because there was not and could not have been a valid closed-shop contract in that case.

The judgment of the Court of Appeals is reversed, with directions to the Board to dismiss the complaint.

*Reversed.*

MR. JUSTICE REED and MR. JUSTICE BURTON dissent. In their opinion the adjustment between § 7 and § 8 (3) made by the National Labor Relations Board is permissible. The use of the closed-shop privilege to interfere with the free exercise of the laborers' choice does not seem to them to be within the purpose of the Labor Act.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.