QUAKER STATE OIL REFINING CORPO-
RATION v. NATIONAL LABOR RE-
LATIONS BOARD.

No. 7623.

Circuit Court of Appeals, Third Circuit.

April 17, 1941.

Rehearing Denied June 5, 1941.

Charles B. Prichard, of Pittsburgh, Pa.,
and M. C. Mallon, of Washington, D. C.,
for appellant.

Harry Brownstein, of Washington, D.
C. (Robert B. Watts, Gen. Counsel, Laur-

ence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Richard C. Barrett, all of Washington, D. C., on the brief), for National Labor Relations Board.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This is a petition by the Quaker State Oil Refining Corporation to review and set aside an order of the National Labor Relations Board. The petitioner is and for many years has been engaged in the oil refining business. It has three refineries in Pennsylvania and one in West Virginia. The refinery with which we are here concerned is located at Farmers Valley, McKean County, Pennsylvania.

Upon a charge filed by the International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers, which we shall call the Union, the Board issued a complaint against the petitioner charging it with certain unfair labor practices. After hearing before a trial examiner the Board found that the petitioner had been guilty of unfair labor practices, in restraining its employees from joining the Union and in discharging one of them, Richard Curran, because of his union activity. The Board ordered the petitioner to desist from these practices and to reinstate Curran with back pay.

The sole question for our determination is whether the Board's findings are supported by substantial evidence. In Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624, the rules by which we are to be guided in making this determination have been clearly stated by Judge Dobie. As he points out the difficulty is that they are very much simpler to state than to apply. Certain it is, however, that we must analyze the evidence and determine its weight to the extent which may be necessary to decide whether it is evidence which "a reasonable mind might accept as adequate to support a conclusion,"[1] and which affords "a substantial basis of fact from which the fact in issue can be reasonably inferred,"[2] and not merely evidence which creates a suspicion or gives equal support to inconsistent inferences.

Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989. In making such an analysis of the evidence in a case such as the one before us the evidence relied on by the Board should be considered in the light of the general background of labor conditions prevailing in the petitioner's plant. Martel Mills Corp. v. National Labor Relations Board, supra, 114 F.2d page 628.

This background discloses a complete absence of labor difficulties at the Farmers Valley refinery. When Wilder, the Union organizer, appeared in the vicinity in September, 1939, he went to see Rockman, manager of the Farmers Valley refinery, by whom he was referred to Hunter, director of operations of all four refineries. Both conferences were entirely friendly and Hunter told him that the company had no objection if the men had any use for his services. Shortly afterward a union newspaper, published in the nearby city of Bradford, printed a report of these interviews erroneously indicating that the petitioner had recognized the Union. Rockman thereupon called together the plant superintendent and the various foremen and told them what had actually happened. At the same time he definitely instructed them not to say anything against unionization or for it but to take a strictly neutral attitude. Wilder's organizational activities continued. Petitioner's employees joined the Union in increasing numbers. A majority had joined by November 20, 1939. A consent election was held on January 30, 1940. The Union was chosen bargaining agent of the petitioner's employees by an overwhelming vote and was at once recognized by the petitioner as such.

The Board found the petitioner guilty of two unfair labor practices. The first was that two supervisory employees by their statements to individual employees discouraged membership in the Union. The supervisors in question were Healy, the field or pipe line superintendent, and McElhatten, the superintendent of maintenance at the refinery. Healy asked one employee what the employees figured could be gained by membership in the Union and said that it would be lots cheaper and the employees just as far ahead, if they hired a local attorney to represent them rather than put-

---

[1] Mr. Chief Justice Hughes in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126.

[2] Mr. Justice Stone in National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660.

ting out quite a lot of money and not getting much in return for it. He made similar remarks to another employee and declared to a third who said he hoped to gain seniority rights that there was no such thing. To a fourth he said he did not see how the Union could benefit the employees and that he believed the petitioner would shut the plant down before giving recognition to it. McElhatten stated to one employee with reference to the welding of certain tubes that prior to the Union that work would have been done at the petitioner's shop but after the Union they intended to send the work away. He also said that in future they would let out to contractors what work they could. He made a similar statement to another employee. In the case of Healy none of the employees to whom he talked was under his supervision.

It is quite clear that all of these conversations took place casually in the course of conversations between the individuals concerned. There is no evidence that they had the slightest effect in actually preventing or discouraging membership in the Union. The Board nevertheless found that the petitioner was responsible for the statements made by Healy and McElhatten and that thereby it interfered with, restrained and coerced its employees in the exercise of the rights of self-organization and collective bargaining guaranteed them by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. We do not think that this finding is supported by substantial evidence. Isolated statements by minor supervisory employees made casually in conversation with fellow employees without the knowledge of their employer and not in the course of their duty or in the exercise of their delegated authority over those employees ought not to be too quickly imputed to their employer as its breach of the law. National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 479. This is particularly so where, as here, there is no evidence of any policy on the part of the employer to authorize or encourage opposition to union activity. Martel Mills Corp. v. National Labor Relations Board, supra, 114 F.2d page 633. The situation in the case before us is quite different from that which appeared in our recent case of Oughton v. National Labor Relations Board, 3 Cir., 118 F.2d 486. There the statements by supervisory employees were clearly coercive in character and were made to employees over which those

who made them had direct authority. We conclude that the Board erred in inferring that the petitioner was responsible for the statements of Healy and McElhatten, and in finding that these statements constituted an unfair labor practice on its part.

The second unfair labor practice charged to the petitioner was its discharge of Curran on November 6, 1939, which the Board found was ordered because of his activity in the Union. To determine whether this finding is supported by the evidence requires the recital of some of the facts shown by the testimony. In 1933, pursuant to the provisions of the National Industrial Recovery Act, 48 Stat. 195, the petitioner had reduced the work week from 56 hours, 8 hours on each of 7 days, to 36 hours, 6 hours on each of 6 days. This was done in order to spread work and the employees were instructed that they were not to work regularly at any other employment in their spare time which was thus largely increased.

From August, 1936, to September, 1937, Curran while in petitioner's employ worked regularly from 7 to 9 hours a day as a bartender in a taproom opened in 1936 by his friend Brenneman. At the beginning both Curran and Brenneman had spoken to Rockman, the refinery superintendent, about the matter and Brenneman had indicated that the work would be temporary. On September 10, 1937, Rockman informed Curran that his employment in the taproom had proved to be regular and therefore constituted a violation of the rule against outside employment and that he would have to give up one job or the other. Curran agreed to give up his work as bartender and did so. Rockman thereupon posted on the bulletin board a notice to the employees calling their attention to the rule and indicating that it would be strictly followed. During the following two years Curran did not work for Brenneman except on a few occasions when he was unusually busy. On September 16, 1939, however, one of Brenneman's regular bartenders quit and Brenneman asked Curran to help him out until he could get a new man. Curran agreed and thereafter worked regularly as a bartender for Brenneman from 3 to 5 hours daily until his discharge by the petitioner in the following November.

Curran was active in the Union's organization effort. He spoke to many employees about their joining the Union. He was a member of a committee appointed to

634

prepare a collective agreement to be submitted to the petitioner. At an organization meeting of the Union on October 27th, which he did not attend, he was chosen vice-president of the newly formed local. On October 31st it was reported to Rockman by two employees that Curran was working regularly at the taproom. Rockman at the time was about to leave town on a business trip and asked his assistant, Megivern, to investigate and report upon his return. The latter found Curran working behind the bar on three of the following four days and so reported to Rockman. On November 6th the latter sent for Curran and in the presence of Megivern and the plant superintendent, Anderson, informed Curran that it had been reported to him that he was working steadily in the taproom. This, after some hesitation, Curran admitted. Rockman then reminded him of his agreement in September, 1937, to give up this work and informed him that he was discharged for his repeated violation of the petitioner's rule.

The Board found that the discharge was not for the reason given by Rockman but rather because of Curran's union membership and activity. It contends that this fact may fairly be inferred from the facts in evidence. It points to cases of other employees who were permitted to engage in outside activities without interference. None of these cases was analogous to that of Curran, however. The record does disclose several cases of other employees who were required to give up regular outside work. In no case, except that of Curran, did any such employee again engage in the outside work which he had been required to give up. The Board also asserts that the fact may be inferred from evidence which indicates that Rockman was hostile to the Union and it points to a conversation which Curran testifies he had with him shortly after September 29, 1939. We think that the conversation referred to is not capable of the construction which the Board places upon it and that the inference sought to be drawn from it is belied by the other evidence as to Rockman's impartial attitude.

█ Finally the Board urges that since Rockman testified that the usual penalty for a second infraction of a rule was one week's lay off, the imposition of the more drastic penalty of dismissal in Curran's case justifies the inference of discrimination against him. Here again the analogy is not apt. None of the other cases referred to by Rockman involved violation of the rule against outside employment. There was no precedent for the treatment of Curran's admitted second violation of this rule. Consequently the petitioner was free, without being subject to a charge of discrimination, to impose the penalty of dismissal if, as Rockman testified, it believed it to be proper to do so in order to enforce the rule in question. To hold that an employer may not impose the penalty of dismissal for an admitted second violation of a rule which is an important condition of employment, where there is no evidence that a lesser penalty for an offense of that character was customarily imposed, is to encroach upon the employer's right to discharge his employees, with the normal exercise of which right the National Labor Relations Act was not intended to interfere. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. We conclude that there is no substantial support in the evidence for the Board's finding that Curran was discharged because of his union membership and activity.

A decree will be entered setting aside the order of the National Labor Relations Board.