NATIONAL LABOR RELATIONS BOARD v. RELIABLE NEWSPAPER DE-LIVERY, Inc.

No. 10311.

United States Court of Appeals, Third Circuit.

Argued Dec. 22, 1950.

Decided Feb. 28, 1951.

---

2. Section 163, Naval Courts and Boards, 1937.

Thomas J. McDermott, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Frederick U. Reel, all of Washington, D. C., on the brief), for petitioner.

Julius Kass, New York City (Bandler, Haas & Kass, New York City, on the brief), for respondent.

Before MARIS, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The National Labor Relations Board found that respondent had violated Section 8(a)(3) of the Act[1] " * * * and thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7, in violation of Section 8(a)(1) of the Act."[2] The Board now petitions this court for enforcement of its order based on its said findings and issued against respondent on February 15, 1950. It is conceded by respondent that its operations affected interstate commerce within the meaning of the Act, as amended.[3]

Respondent, a New Jersey corporation, has its places of business in that state. It is engaged in the purchase, sale, delivery, and distribution of newspapers, magazines, and

1. 29 U.S.C.A. § 158(a) (3).

2. 29 U.S.C.A. § 158(a) (1).

3. 29 U.S.C.A. § 152.

other periodicals. On or about January 2, 1946, it entered into a collective bargaining contract with Newspaper Mail and Deliverers' Union of New York and Vicinity "for and in behalf of the members thereof now employed and hereafter to be employed * * *." That contract was to run until October 16, 1947 and was extended to October 16, 1948 by a supplemental agreement dated August 22, 1946. On October 9, 1947 there was another supplementary agreement between the parties which increased wage rates and stipulated that if the parties made a new contract any increase in pay granted would be applicable retroactively for the last three months of the existing contract. That contract with its supplements provided for a closed shop in favor of the Newspaper and Mail Deliverers' Union but by its terms allowed the employer to hire necessary nonunion employees whenever they were not furnished by the union. These were replaceable by union members.

During the period with which we are concerned respondent had fourteen employees; six of these were union members and the remaining eight non-union. That strange condition arose because the recognized bargaining agent was in reality, as the Trial Examiner found, a closed union. Its constitution and by-laws provided that by a two-thirds vote of the "General Body" the "books of this Union shall remain closed" to new members with the exception that under certain conditions "one legitimate male issue" of a member could be admitted to membership.

A new agreement was executed by the parties on October 25, 1948. By its terms the union was the exclusive bargaining representative for all of the employees engaged in the delivery and handling of the newspapers, etc. Wage increases were provided for. The union agreed to furnish all necessary employees. Respondent agreed to employ only members of the union thirty days from the effective date of the agreement and that any new employees after that date would be required to become members of the union within thirty days following the beginning of employment.

In addition to the three months retroactive pay granted its union employees under the second supplement to the 1946 contract, respondent extended that time an additional week and gave its six union employees back pay on that basis. Respondent did not allow any of its eight non-union employees similar retroactive pay. Its stated reason for this course of conduct was that the amount involved was substantial and that it was under no contractual obligation to make retroactive payments to its non-union workers. The stipulation of facts presents the reason in this fashion: " * * * because said employees who were not members of the Union, were not covered by the contract dated January 2, 1946, and the Supplementary Agreements dated August 22, 1946, and October 9, 1947."

■ Ostensibly, under the 1946 agreement and its supplements, there existed a closed shop in favor of a union which was the bargaining agent solely for its own members. In fact there was a majority of non-union employees who had no bargaining agent at all. At the time the 1946 contract was entered into, a closed shop was not contrary to the Act if consonant with the proviso to Section 8(3). That proviso allowed a closed shop to an unassisted union which represented a majority of employees at the time the employment agreement was executed. There is no actual statement in the stipulation of facts that on the date of the 1946 contract the carrier's union represented either a majority or minority of the carrier employees. It is undisputed, as above noted, that, during the period with which we are concerned, eight of respondent's fourteen carrier employees were non-union and six were union. The union members were entitled to self-organization under Section 7 of the Act, and had the right to choose the carrier's union "as their representative for collective bargaining and to have contracts made as the result of that bargaining." Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126. Under the particular facts the carrier's

union was merely the collective bargaining agent for those employees who were *its* members. There had been *no* Board election. The carrier's union had not been replaced as bargaining agent by a selection by a majority of employees and as was said in the Edison case, supra, 305 U.S. at page 237, 59 S.Ct. at page 220, "* * * in the absence of such an exclusive agency the employees represented by the Brotherhood [carrier's union], even if they were a minority, clearly had the right to make their own choice."

■ The above may well be the reason why no issue is presented in this case as to the validity of either the 1946 contract with its supplements or of the 1948 contract. Cf. In the Matter of Briggs Indiana Corporation, 63 N.L.R.B. 1270; In the Matter of Essex County News Co., Inc., 76 N.L.R.B. 1340. The Examiner, expressing his personal comment in a footnote to his report, does suggest that both contracts are vulnerable because of the closed union situation. But he states flatly in the body of his report under the sub caption "Contentions of the Parties" that "The General Counsel makes no attack upon the validity of the 1946 agreement or its supplements nor upon the 1948 agreement." This ruling of the Examiner was affirmed by the Board and is not challenged by either side. It leaves as the only question confronting us, whether, under all the circumstances, the employer's action in allowing the back pay differential to its union employees and not making the same sort of payment to its non-union personnel violated the Act as was found by the Board. Only four of the eight non-union employees were named in the charge and complaint before the Labor Board. The affirmative proceedings recommended by the Examiner were confined to those four. The Board in its order included "all other *non-union* employees who were similarly situated * * *."

Though, in our view, this action by the Board was unwarranted[4] it need not be gone into at length as we think the Board erred in its primary conclusion.

The reason for the Board's decision, as stated by that body, is that "* * * we predicate our finding on the Respondent's disparate treatment of employees on the basis of union membership or the lack of it." The Board specifically stated that it did "* * * not adopt other independent reasons given by the Trial Examiner." The violation found is of Section 8(a) (3) which the Board states resulted in a violation of Section 8(a) (1).[5] If there was no offense under 8(a) (3) that is the end of the matter. That statute in its pertinent language reads:

"It shall be an unfair labor practice for an employer—

* * * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization".

The Board argues that "discrimination" is the key word of the statute. It refuses to accept the plain language of 8(a) (3) which makes the particular offense encouragement or discouragement of membership in any labor organization by means of discrimination in regard to hire or tenure of employment or any term or condition of employment. See Professor Ward's article, 48 Yale L.J. 1152, 1156. It is true that in most 8(a) (3) cases the employer's alleged conduct concerns discrimination for or against the union by palpably encouraging or discouraging membership therein. But that is not this case. We are here dealing with an unusual problem which must be approached realistically, with common sense and fairness. There is no contention that the employer favored or dis-

4. If the Board had intended to include all the other non-union employees allegedly similarly situated, the complaint should have been amended accordingly, notice given to respondent and sustaining proof introduced. Cf. Consolidated Edison Company v. N. L. R. B., 305 U.S. 197, 238, 59 S.Ct. 206, 83 L.Ed. 126.

5. The violation of Section 8(a) (1) found is the interference with, restraint and coercion of the respondent's employees in their right to freely organize and designate bargaining agents as guaranteed by Section 7.

favored either the union or the non-union group. The employer was faced with a unique condition. The union bargaining agent supplied less than half of the employees needed to operate the business. The result was the hiring of non-union help. Even if the lack of intention to discriminate on the part of the employer is assumed to be of no account and if whether discrimination occurred be judged entirely from the facts, it still remains true, as conceded, that the non-union employees were unable to join the union. Salerno is the only one of the four complainants who testified that the retroactive pay affected his desire to join. His evidence was not very satisfactory. He definitely indicated that he was not anxious to join the union and showed familiarity with the requirements for membership in it when he testified, "All I know that they did take in was sons." Two others of the four were not interested in becoming members. The third had been rejected by the union prior to the retroactive pay question arising.

Unquestionably there was a difference between the treatment of the members of the union bargaining agent and the non-union employees with respect to the back pay increase. Nevertheless the non-union men were not deprived of anything that was rightfully theirs. The employer company, functioning under an unhappy arrangement whereby the bargaining union represented a minority of the employees, did give the union members some retroactive back pay but by so doing the employer did not deprive its non-union workers of anything to which they were entitled. They had been given their full wages during the period which later became subject to union retroactive pay. There never was any arrangement with them then or later that they would receive further payments for that time should a new contract with an increased wage scale be agreed upon. If they had been members of the union they would have been within the contract and would have received the extra money. It was not the fault of the employer that they were unacceptable as union members. The union employees were so paid because that was the employer's contract obligation to them. The non-union employees made no attempt to correct the anomalous situation either by petitioning the Board for an election of a bargaining agent or any other action under the Act or in the state courts with the exception of this proceeding. Under all the facts we fail to see the existence of discrimination. To the non-union employees what the householder said long ago to one of a discontented group of his vineyard laborers could well be repeated, "Friend, I do thee no wrong. Didst thou not agree with me for a penny? Take what is thine and go thy way." [6]

Even if we should assume that the disparity brought about by the retroactive payments amounted to discrimination, then, under the statutory language, we must go further and ascertain whether that discrimination encouraged membership in the Newspaper and Mail Deliverers' Union of New York and Vicinity. And we do not find substantial evidence of that encouragement. The non-union men knew that the employer was contractually bound to give the union members the retroactive increase if the new contract that increased wage rates was entered into. The non-union workmen also knew that in effect they were barred by the union from becoming members thereof and that the employer was powerless to assist them. The consequence of the delivery company living up to its obligation might cause its non-union employees to feel badly that the union would not permit them to join it and thereby enable them to share in the windfall. That result, however, cannot be here reasonably construed as evidence of an 8(a) (3) violation by the company because the assumed discrimination, under the peculiar uncontroverted facts, has not in this in-

6. Under substantially the same sort of facts where a non-union employee was threatened with discharge and replacement by a member of the same union involved in this matter, the New Jersey Court of Chancery issued an injunction restraining the union from interfering with the non-member's employment. Wilson v. Newspaper and Mail Deliverers' Union, 123 N.J.Eq. 347, 197 A. 720.

552

stance produced the statutory offense of encouraging membership in the deliverers' union.[7] It would be necessary for us to completely close our eyes to the admitted facts in order to accept the Board's statement that the inevitable effect of the back wage payment was to encourage union membership because we know that membership in the union for non-union workmen was a practical impossibility.[8]

In view of the unusual situation presented, cases urged by the Board of the type of National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528, 533, and Republic Aviation Corporation v. National Labor Relations Board, 324 U.S. 793, 805, 65 S.Ct. 982, 89 L.Ed. 1372, are not controlling. National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553, cited by the Board, is not opposed to our conclusion. There the court found that employer assistance to a union by unfair labor practice had been clearly established. In passing, the language from that opinion quoted by the Board would indicate that the employer's motive was of, at least, some importance. While our decision in Quaker State Oil Refining Corp. v. National Labor Relations Board, 3 Cir., 119 F.2d 631, had to do with alleged 8(3) violations which arose out of the actions of employees, the underlying thought of that case is quite material here. We there said, 119 F.2d at

page 633: "It is quite clear that all of these conversations took place casually in the course of conversations between the individuals concerned. There is no evidence that they had the slightest effect in actually preventing or discouraging membership in the Union." See also National Labor Relations Board v. Public Service Co-ordinated Transport, 3 Cir., 177 F.2d 119.

Generally speaking, the proposition that in order to establish an 8(a) (3) violation there must be evidence that the employer's act encouraged or discouraged union membership has widespread support. In National Labor Relations Board v. Air Associates, Inc., 2 Cir., 121 F.2d 586, the court held at page 592: "Section 8(3) requires that the discrimination in regard to tenure of employment have both the purpose and effect of discouraging union membership." The later decision in that same circuit, National Labor Relations Board v. Cities Service Oil Co., 129 F.2d 933, 937, in no way restricted that language. In Stonewall Cotton Mills, Inc., v. National Labor Relations Board, 5 Cir., 129 F.2d 629, the Board had found certain lay offs and discharges to have been in violation of Section 8(3). The court said, 129 F.2d at page 632: "To make out a case under it [Section 8(3)], it must appear that an employer has by discrimination in regard to hire, etc., encouraged or discouraged membership in any labor organization."

7. We think this is true not only with reference to current non-union employees but also regarding possible future employees to whom union membership is just as impossible of accomplishment as it is to the present non-member employees. Nor do we think that there is any merit in the Board's suggestion that the union employees may be encouraged to retain a membership they might otherwise relinquish. There is no inference in the record that any member ever left this extraordinary protected union except through death.

8. The Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., which is far more solicitous for the rights of the non-union employees than was the original National Labor Relations Act of 1935, 29 U.S.C.A. § 151, et seq., which was in effect at the time the 1946 contract was entered into, expressly takes care of the

question raised by this appeal. Section 8 (a) (3) of the 1947 Act reads: " * * * no employer shall justify any discrimination against an employee for nonmembership in a labor organization (a) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

This elaborate statement lends strong support to respondent's argument that the allowance of the retroactive pay by the employer was not only not per se discriminatory under the Wagner Act, but was not contemplated by that statute.

This conclusion was not disturbed by the motion for rehearing, 129 F.2d 633, which was disposed of entirely upon evidential grounds. To the same effect see National Labor Relations Board v. Draper Corp., 4 Cir., 145 F.2d 199, 202, 156 A.L.R. 989; Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 139 F.2d 855, 858; National Labor Relations Board v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 690; Wells, Inc. v. National Labor Relations Board, 9 Cir., 162 F.2d 457, 459, 460; National Labor Relations Board v. Robbins Tire & Rubber Co., Inc., 5 Cir., 161 F.2d 798, 801.

As above indicated, we find no substantial evidence in the record to justify the Board's holding that respondent had violated Section 8(a) (3) of the Act " * * * and thereby interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7, in violation of Section 8(a) (1) of the Act."

A decree will be entered setting aside the order of the National Labor Relations Board.