**BLACK GRIEVANCE COMMITTEE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Philadelphia Electric Company, Intervenor,**

and

**Independent Group Association, Intervenor.**

No. 84-3138.

United States Court of Appeals, Third Circuit.

Argued Nov. 29, 1984.

Decided Dec. 13, 1984.

Harold R. Berk (argued), Philadelphia, Pa., for petitioner.

Susan Williams (argued), Collis Suzanne Stocking, Robert E. Allen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

H. Thomas Felix II (argued), Karl A. Fritton, Sprecher, Felix, Visco, Hutchison & Young, Philadelphia, Pa., for intervenor, Philadelphia Elec. Co.

Robert G. Kelly, Jr., Brenda M. Flock, Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for intervenor, Independent Group Ass'n.

Before HUNTER and WEIS, Circuit Judges, and COHEN,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case arises on a petition for review of a final order of the National Labor Relations Board ("NLRB" or "the Board") dismissing an unfair labor practice complaint against Intervenor, Philadelphia Electric Company ("PECO"). Petitioner, Black Grievance Committee ("BGC"), is an aggrieved person within the meaning of section 10(f) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(f) (1982), and jurisdiction is based on that section. Because we conclude that the Board's decision is contrary to the language and purposes of the Act, we will set aside the Board's order and remand for further proceedings consistent with our opinion.

### I.

The relevant background facts in this case are undisputed.[1] The Independent Group Association ("IGA") represents between 4200 and 4600 of PECO's employees, and has dealt with PECO on issues concerning wages, hours, and working conditions of its members for over 40 years. App. at 6. The IGA has not, however, ever been recognized or certified under the Act as the exclusive bargaining representative for PECO's employees. Nevertheless, IGA representatives meet monthly with PECO's personnel representatives, and the IGA is identified in PECO's employee handbook as the employee organization with which PECO discusses employee concerns. App. at 6. PECO also allows the IGA to use company bulletin boards and parking lots, and implemented a dues check-off procedure for IGA members in 1981. App. at 6–7.

The BGC was formed in 1968 by several black employees who believed that the IGA was unresponsive to alleged discriminatory practices on the part of PECO. App. at 9. Although the BGC is not limited to minority-group employees, it is dominated by blacks, and exists primarily to eradicate perceived discriminatory practices in the workplace. App. at 10. PECO representatives have met with BGC representatives concerning many issues, but have refused to discuss individual BGC members' grievances with BGC representatives. App. at 9. It is this refusal to meet over individual grievances that is at the heart of this case.

PECO provides a grievance procedure for all of its employees. This procedure is detailed in the Employee Handbook, and consists of three steps: 1) individual employee discussion with the immediate supervisor; 2) individual employee discussion with successively higher levels of supervi-

---

* Honorable Mitchell H. Cohen, United States District Judge for the District of New Jersey, sitting by designation.

1. As did the Administrative Law Judge ("ALJ") below, we will rely on the stipulation of facts agreed to by the parties. App. at 29–34.

sion; and 3) individual employee discussion with a representative of PECO's personnel department. App. at 35. At the latter two steps, an individual may be accompanied by another employee of the company, but that employee may not act as a group representative. As a general rule, PECO issues no written responses to these grievances, and employees present their grievances orally. App. at 8.

PECO also provides, however, an alternative grievance procedure for members of the IGA. App. at 35. After the initial discussion with the immediate supervisor, an IGA member may choose to have his grievance presented in writing at one of the monthly meetings between representatives of the IGA and PECO. After the grievance is discussed at this meeting, representatives of PECO's personnel department investigate the grievance, and the vice-president in charge of personnel issues a written answer. In the event the grievance is denied, another meeting is held between the employee, an IGA representative, and the employee's supervisors, and is mediated by PECO's manager of personnel and industrial relations. The manager then recommends a disposition to the vice-president of personnel, who either reaffirms his earlier decision or issues a new answer. App. at 4.

PECO's personnel policies, therefore, seemingly accord the IGA and its members a privileged status in the presentation and resolution of individual grievances. The ALJ found that the effect of this privilege is to give IGA members greater leverage in their dealings with PECO. App. at 17. The dispute in this case arose after PECO's vice-president of personnel refused to allow the BGC and its members similar privileges. Specifically, PECO refuses to meet with BGC representatives to discuss individual grievances of BGC members, and refuses to acknowledge the BGC status of employees who accompany BGC members to grievance meetings under the procedure for non-IGA members. App. at 8. Further, it is undenied that PECO's motivation for denying the BGC equal status is PECO's desire to have all grievances formally processed through one group (i.e., the IGA), and its hesitance to deal with racially segregated employee organizations. App. at 32.

After a charge was filed by a BGC representative, the Board's General Counsel issued an unfair labor practice complaint, charging PECO with a violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1982), for refusing to accord the BGC equal status to the IGA in the presentation and resolution of individual grievances. App. at 57–58. After a hearing, an Administrative Law Judge dismissed the complaint, holding "[i]n my view favoritism or partiality to the IGA cannot violate the rights of the BGC and its adherents where neither organization seeks section 9(a) status." App. at 17. A three-member panel of the Board adopted the ALJ's findings and holding without opinion. 268 N.L.R.B. No. 123 (1984). Because the ALJ's opinion, as adopted by the Board, is unsupported by the language of sections 7 and 8 of the Act, 29 U.S.C. §§ 157, 158 (1982), we now set aside the Board's order.

## II.

We begin our analysis by noting the standard of review appropriate in this case. The Board's factual findings must be affirmed if they are supported by substantial evidence on the record considered as a whole, 29 U.S.C. § 160(e) (1982), regardless of whether we would reach a different conclusion if the matter were before us *de novo*. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The legal precepts applied by the Board to those factual findings, however, are not entitled to such deference. Instead, this court bears the ultimate responsibility to decide and enforce the applicable legal standards. *See, e.g., Graham Architectural Products Corporation v. NLRB*, 697 F.2d 534, 537 (3d Cir. 1983).

Although we might decide differently if the matter were before us *de novo*, we find that the ALJ's factual findings concerning

the privilege accorded IGA and its members because of the differences in the grievance procedures are supported by substantial evidence in the record as a whole. App. at 17 ("It is likely that [PECO's] treatment of IGA and BGC affords a certain amount of leverage to the IGA and may very well inhibit organizational activities by the BGC."). The focus of this opinion, therefore, is on the correctness of the legal standards applied to those factual findings.

■ In this case, the relevant legal precepts are found in the statutory language itself. Section 7 of the Act states in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,....

29 U.S.C. § 157 (1982). Section 8(a)(1) of the Act states that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the right guaranteed in section 157...." 29 U.S.C. § 158(a)(1) (1982). Neither direct proof of interference with protected rights nor anti-union animus is necessary to sustain a violation of section 8(a)(1), so long as the employer's activity would tend to interfere with, coerce, or restrain a reasonable employee. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

■ The parties agree that the activities of the BGC members in banding together to present their grievances to PECO are protected by section 7 of the Act. *See, e.g.,* *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (non-union employees who join together to complain about lack of heat in plant engaged in concerted activity). Indeed, the very formation of the BGC is protected by its members' rights to "self-organization" to "form, join, or assist labor organiza-

tions," and to "engage in other concerted activity...." 29 U.S.C. § 157 (1982).[2] Our analysis, then, is focused on whether, under the facts of this case, PECO interfered with, restrained, or coerced its employees in organizing, forming, joining, or assisting the BGC.

PECO and the Board correctly argue that because the BGC has never been recognized or certified as the exclusive bargaining representative of PECO's employees, PECO had no independent obligation to listen to or recognize the BGC for purposes of its members' grievances. *See, e.g., Morrisville Cotton Mills*, 2 N.L.R.B. 952, *modf'd and enf'd*, 94 F.2d 61 (4th Cir.1938). They also correctly point out that the agreement with the IGA to accord its members privileged treatment for grievance purposes is not, standing by itself, unlawful under the Act. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (holding that "members-only" agreements with non-majority unions do not violate sections 8(a)(2) or 8(a)(1) of the Act). But the Board and PECO err when they conclude that the combination of the two principles, privileged treatment of one non-majority union with a refusal to treat another equally, does not violate the Act.

The underlying premise to the decision of the ALJ and the Board is that privileged treatment of one non-majority labor organization over another does not violate the Act where neither organization seeks exclusive bargaining representative status under section 9(a) of the Act, 29 U.S.C. § 159(a) (1982). App. at 19–20. The ALJ's reasoning seemed to be that because neither the IGA nor the BGC sought to be the exclusive bargaining representative of PECO's employees, PECO's privileged treatment of the IGA neither assisted nor coerced employees in selecting the bargaining representative of their choice. Absent this encouragement or discouragement in the choice of bargaining representative, the ALJ concluded that PECO's activities did

---

**2.** The parties do not dispute that the BGC, as well as the IGA, are "labor organizations" within

the meaning of section 2(5) of the Act, 29 U.S.C. § 152(5) (1982).

not interfere with any protected activities of the BGC or its members.

The fatal flaw in the ALJ's reasoning and the Board's silent adoption of its conclusion is the limitation placed on employees' rights under section 7. Although the ALJ correctly noted that encouragement or discouragement of an employees' choice of exclusive bargaining representative violates the Act, he erred in not recognizing that the protection of section 7 goes *beyond* selection of an exclusive bargaining representative, and includes the right to be free from interference with *any* organizational activity.

The language of section 7 itself recognizes a distinction between the rights to "self-organization," to "form, join, or assist labor organizations," to "engage in other concerted activity," and the right to "bargain collectively through representatives of their own choosing." 29 U.S.C. § 157 (1982). The right to band together for self-organizational purposes has consistently been recognized apart from the right to choose an exclusive bargaining representative. *See, e.g., NLRB v. Northeastern University*, 601 F.2d 1208, 1216–17 (1st Cir.1979) (preventing one employee organization from using student center while allowing other employee organizations to do so violates section 8(a)(1)); *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 n. 6 (3d Cir.1969) ("The joining in protests or demands, even by a small group of employees, if in furtherance of their interests as such, is a concerted activity protected by the Act. It is not necessary that union activity be involved or that collective bargaining be contemplated," quoting from Annot., 6 A.L.R.2d 416, 434 (1949)).

The importance of protecting an employee's choice to organize in one particular group as opposed to another group, even where neither group seeks exclusive bargaining status, is illustrated by the case before us. In 1968, several black employees broke off from the IGA because they believed that the IGA was unresponsive to discriminatory practices at PECO. App. at 9. Because the IGA was not and has never been recognized as the exclusive representative of PECO's employees, the black employees could not force the IGA to handle their grievances fairly or to show greater concern for the alleged discriminatory practices at PECO. *See Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 64, 95 S.Ct. 977, 985, 43 L.Ed.2d 12 (1975) ("[B]y the very nature of the *exclusive* bargaining representative's status as representative of *all* unit employees, Congress implicitly imposed upon it a duty fairly and in good faith to represent the interests of minorities within the unit."). Whether necessary or not, therefore, the BGC members perceived a need to band together to promote their common interest in having their grievances heard concerning discrimination in the workplace.

As the ALJ found, PECO, by favoring the IGA in the presentation of grievances, necessarily encouraged membership in the IGA for those employees who desire a more formal, and presumably more powerful, grievance mechanism, and discouraged membership in the BGC. App. at 17 ("It is likely that [PECO's] treatment of the IGA and BGC affords a certain amount of leverage to the IGA and may very well inhibit organizational activities by the BGC."). Because the BGC was not formed "with a view towards obtaining section 9(a) [exclusive representative] status," however, the ALJ found no violation of section 8(a)(1). This reading of the rights protected by section 7, and enforced through section 8(a)(1), is too narrow, and frustrates one of the central protections of the Act— allowing employees to band together for specific grievances. Because PECO's privileged treatment of the IGA encourages membership in that group and discourages membership in other groups, including the BGC, PECO has interfered with and coerced employee choice in self-organization, and in forming, joining, and assisting a labor organization.

Because of the novelty of the issue before us, we are careful to delineate the scope of our decision.[3] We are not holding that an employer violates section 8(a)(1) merely when it refuses to listen to or accord special status to the grievances of a minority labor organization, even if that refusal will affect the ability of that organization to attract members. Rather, we are holding that when an employer accords one non-majority employee group privileged status over another non-majority group, and thus encourages membership in the former while discouraging it in the latter, he unlawfully interferes with the section 7 rights of employees to band together in the group of their choice, even though neither organization seeks section 9(a) exclusive representative status. To hold otherwise would force employees, if they desire leverage against their employer, to join employee groups favored by the employer, despite the employees' belief that the favored group will not act in their best interest, and cannot be legally forced to act in their best interest. This discourages the right to self-organization, the right to form, assist, and join labor organizations, and the right to engage in concerted activity, and thus violates the Act.

3. The Supreme Court has not considered the issue before us, and expressly reserved decision on a similar formulation of the issue in *Radio Officers' Union v. NLRB,* 347 U.S. 17, 47, 74 S.Ct. 323, 339, 98 L.Ed. 455 (1954) ("We express no opinion as to the legality of disparate payments [between union and non-union employees] where the union is not exclusive bargaining agent...."). Nor does our decision in *NLRB v. Reliance Newspaper Delivery, Inc.,* 187 F.2d 547 (3d Cir.1951) impact on our holding. In that case, an employer was charged with violating section 8(a)(3) and through it, section 8(a)(1), by paying members of a non-majority closed union, but not non-union employees, retroactive pay. This court found no violation of section 8(a)(3) because there was no evidence of discriminatory intent on the part of the employer, and because, even assuming discriminatory intent, the employer's activities could not have encouraged or discouraged the non-union employees into joining the closed union because the closed union would only allow the first male issue of each member to join. 187 F.2d at 552. The first rationale for the court's decision was subsequently discredited in *Radio Officers' Un-*

III.

■ Because we find that PECO's discriminatory treatment of the .BGC constitutes a violation of section 8(a)(1), we must remand to the Board for consideration of PECO's purported business justifications, and for an appropriate remedy if no business justification exists. On remand, however, the Board should consider three last points. First, if the BGC proves its allegation that a determining factor in PECO's decision not to accord the BGC equal privileges to the IGA was the racial composition of BGC's leadership and membership, PECO will have committed an independent violation of section 8(a)(1) for which no business justification exists. *See, e.g., United Packinghouse, Food and Allied Workers International Union v. NLRB,* 416 F.2d 1126 (D.C.Cir.), *cert. denied sub nom. Farmers Cooperative Compress v. United Packing House Workers,* 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *Jubilee Manufacturing Co.,* 202 N.L.R.B. 272 (1973).[4] Second, any purported business justification offered by PECO on remand may not relate to PECO's "preference" for the IGA as employee representative, for it is this very preference, and PECO's failure to accord the BGC and its members similar status, which establishes the prima facie violation of section 8(a)(1).[5]

*ion v. NLRB, supra,* while the second rationale distinguishes that case from the instant one. In this case, the ALJ found that PECO's activities encouraged employees to join the IGA and discouraged membership in the BGC. App. at 18.

4. Race discrimination is not a *per se* violation of the Act. *Jubilee Manufacturing Co., supra.* Rather, there must be a nexus between the alleged discrimination and the interference with section 7 rights. Because the ALJ and the Board found that PECO did not violate the section 7 rights of BGC members, they did not consider whether a nexus existed between the alleged racial discrimination and the interference with section 7 rights. Because we have found a section 8(a)(1) violation to exist, the Board on remand should consider whether a nexus does in fact exist.

5. Indeed, the concept of business justification as an affirmative defense to a section 8(a)(1) violation is generally limited to an employer's legitimate interests in plant safety, efficiency, or discipline. R. Gorman, *Basic Text on Labor Law* 133 (1976).

Finally, we do not suggest that the only appropriate remedies for PECO's conduct are to either dismantle the IGA grievance system or to tolerate separate grievance systems for each non-majority labor organization that requests one. Rather, a grievance system which accords all employees, and not just members of a privileged group, the leverage of group representation for individual grievances will remove the unlawful coercion on employees to either join the privileged group or forego group representation for individual grievances.

The Board's order is therefore set aside, and the matter remanded for further proceedings consistent with this opinion.

Sprouse J., dissented and filed opinion.