## NATIONAL LABOR RELATIONS BOARD v. GERALDINE NOVELTY CO., Inc. (INTERNATIONAL HANDBAG, LUGGAGE, BELT & NOVELTY WORKERS UNION, A.F.L., Intervenor).

### No. 70, Docket 20937.

United States Court of Appeals
Second Circuit.

March 15, 1949.

A. Norman Somers, Asst. Atty. Gen., David P. Findling, Associate Gen. Counsel, Ruth Weyand, Acting Asst. Gen. Counsel, and Marcel Mallet-Prevost, all of Washington, D. C., and Samuel M. Kaynard, of New York City, for petitioner.

H. Andrew Schlusberg, of Gloversville, N. Y., for respondent.

Max H. Frankle, of New York City, for International Handbag, Luggage, Belt & Novelty Workers Union, A. F. L., Intervenor.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This petition brings before us an order of the National Labor Relations Board issued under the Wagner Act, 29 U.S.C.A. § 151 et seq., prior to its amendment by the Taft-Hartley Act. 29 U.S.C.A. § 141 et seq.[1] The Board's decision and order found that the respondent, Geraldine Novelty Company, Inc., had committed unfair labor practices in violation of section 8(1) and 8(3) by the discriminatory discharge of eight employees on October 22, 1945. It directed the respondent to cease and desist from such practices, to offer reinstatement to the discharged employees and to post a specified notice. The respondent's defense is that three of the employees were discharged pursuant to a union shop agreement with the intervenor, for brevity called the A. F. L. union, and that the other five quit their employment voluntarily. The Board's decision and order are reported in 74 N. L. R. B. 1503. We shall assume familiarity with the facts as found by the Board and shall summarize only such of them as are necessary for an understanding of the issues hereafter discussed.

1. The discharges of Miller, Bovee and Iva Marlitt: These three employees were discharged on October 22, 1945 on the demand of an official of the A. F. L. union who had summarily suspended them from that union because of their adherence to a rival C. I. O. union.[2] When Mr. Edelstein, president of the respondent, complied with this demand he knew the reason for their suspension. The discharges were therefore discriminatory and in violation of § 8(3) of the Act unless the employer was protected, as it claims, by the proviso which permits a contract for a union shop. For several years the A. F. L. union had been the collective bargaining representative of the employees in the respondent's plant at Gloversville, N.Y., and a series of contracts had been entered into between the union and the employer requiring the maintenance of a union shop. The first contract expired November 1, 1941. Before its expiration a second contract was executed on August 21, 1941, which was to run to November 1, 1943. Fourteen days before that expiration date, a third contract, dated October 18, 1943, was made for a term expiring November 1, 1945. This was replaced on September 18, 1945 by a fourth contract which was to run for two years from its date. The Board ruled that neither the third contract expiring November 1, 1945 nor the premature extension thereof by the fourth contract executed September 18, 1945 could protect the employer from the charge of having discriminated against the three discharged employees. This presents an important question of law. See 56 Yale L. J., 1048-1059.

Consistently with the purpose of the Act to insure to employees the right to have a collective bargaining representative of their own choosing, the Board has established the administrative doctrine that once the representative has been certified, or recognized by contract, there must be some measure of permanence to the relationship. Such period of stability usually extends for about a year in the case of a

---

[1] The amendments made by the latter Act became effective August 22, 1947, 61 Stat. 152, one day after the order on appeal was issued.

[2] On October 26, 1945 the A. F. L. instituted proceedings for their expulsion and on November 5, 1945 they were notified that charges of "disloyalty" had been sustained and they were expelled from the union.

certified union without a contract, or until near the end of the contract term, if a union contract exists.[3] That this is a reasonable administrative ruling this court has recognized in National Labor Relations Board v. Century Oxford Mfg. Corporation, 2 Cir., 140 F.2d 541, 542, certiorari denied, Century Oxford Mfg. Corporation v. N. L. R. B., 323 U. S. 714, 65 S.Ct. 40, 89 L.Ed. 574; although no union shop contract was there involved. A necessary corollary of it is that employees must have the privilege at some time to campaign for a rival union in spite of an existing contract, else the union which first got in could remain indefinitely as the bargaining representative by simply renewing its contract before, or immediately after, the expiration of the contract term.[4] This corollary the Board recognized in Matter of Rutland Court Owners, Inc., 44 N. L. R. B. 587, 46 N. L. R. B. 1040. We approved it in National Labor Relations Board v. American White Cross Laboratories, Inc., 2 Cir., 160 F.2d 75. See also Colonie Fibre Co. v. National Labor Relations Board, 2 Cir., 163 F.2d 65; Local No. 2880, etc., v. National Labor Relations Board, 9 Cir., 158 F.2d 365, 368, certiorari granted 331 U. S. 798, 67 S.Ct. 1305, 91 L.Ed. 1824, certiorari dismissed, 332 U. S. 845, 68 S.Ct. 347; cf. Wallace Corp. v. National Labor Relations Board, 323 U.S. 248, 256, 65 S.Ct. 238, 89 L.Ed. 216; Taft-Hartley Act amendments, § 8(a) (3) (A) and (B). The so-called Rutland Court rule means that, regardless of a union shop contract, the employees are free during a reasonable period preceding the end of the contract term to engage in rival union activity for the purpose of bringing in a new collective bargaining representative after the current term has expired. Consequently an employer who discharges an employee at the request of the union with knowledge that he has been denied union membership be-

cause he favored a rival union during the period when employees are privileged to advocate a change in the collective bargaining is guilty of discrimination. Under this interpretation of § 8(3), which we think is correct, the third contract afforded no protection to the respondent, for Mr. Edelstein knew why the three employees had been suspended, and their adherence to the C. I. O. union was within "a reasonable period preceding the end of the contract term."

 The respondent, however, contends that the controlling contract is not the third but the fourth, which was executed on September 18, 1945. Hence it argues that the rival union activities for which the employees were suspended occurred at the beginning of the new contract term, not at the end of the old contract term, and consequently the Rutland Court rule is inapplicable. The Board rejected this contention. In administering the representation provisions of the Act, the Board has established what it calls the "premature extension rule." It has ruled that where an employer and a union before the expiration date of an existing contract execute a new contract extending the same collective bargaining status for a further period, the new contract will not be held a bar to a redetermining of the bargaining representative prior to the expiration of the original contract. Matter of Wichita Union Stockyards Co., 40 N. L. R. B. 369, 372; Matter of American White Cross Laboratories, Inc., 60 N. L. R. B. 1148, 1149-1151; Matter of Blair Limestone Co., 70 N. L. R. B. 689, 690–692; Matter of Don Juan, Inc., 71 N. L. R. B. 734, 735–736; National Labor Relations Board, Twelfth Annual Report, pp. 12–13. Any other conclusion would seat the existing representative permanently in the saddle, since neither the rival union nor the

---

[3] Matter of Kimberly-Clark Corp., 61 N.L.R.B. 90, 92–3; Matter of Detroit & Cleveland Navigation Co., 29 N.L.R.B. 176, 179–180.

[4] This is particularly apparent if the contract contains, as it frequently does, a clause providing for its automatic renewal unless notice to the contrary is given within a specified time before the expiration of the stated term. The

Board has determined that employees may properly raise a representation question, or engage in rival union activities if they do so a reasonable time prior to the automatic renewal date or "Mill B" date as it is known. See Matter of Mill B, Inc., 40 N.L.R.B. 346, 351: Matter of Corcoran Metal Products Corp., 45 N.L. R.B. 439, 441.

employees who desired a change could know when the new contract would be made and therefore could not foretell when it would be appropriate to start election-eering. The only practicable administrative rule is the one the Board has adopted, namely, to allow campaigning during a reasonable time before the expiration of the current contract, or before the "Mill B date" if the contract has an automatic renewal clause.[5] If this be the rule, it is immaterial whether the new contract was made in good faith before the parties were aware of activities on behalf of the rival union or was merely a device adopted for the very purpose of defeating electioneering for a change of representative.[6] See Matter of Blair Limestone Co., supra, at p. 691. This administrative rule should logically be applied in complaint cases no less than in representation cases. We therefore think the Board was right in holding that the "premature extension rule" precludes treating the September contract as a defense to the employer.

It is true that this doctrine puts the employer in a difficult position. If he refuses the demand of the union to perform the union shop contract, his plant may be closed by a strike; if he yields to the demand, he runs the risk that the Board will require reinstatement of the discharged employees and require him to pay them for work never performed. But under the Wagner Act we see no way to insure employees the right to change their collective bargaining representative without imposing this risk upon the employer. Under the Taft-Hartley Act, section 10(c) as amended, the back pay assessment may be made against either the employer or the union as the Board thinks just, but this provision is not retroactive.

█ 2. The discharges of La Mont, Van Nort, Walker and Violet Marlitt: Their employment was terminated on October 22, 1945. The respondent contends they quit voluntarily. The issue is whether there is substantial evidence to support the Board's finding that they were discharged by the respondent because of their adherence to the C. I. O. union. Shortly after having signed cards pledging their loyalty to the A. F. L. union they came to the respondent's office and in protest against the discharge of Miller and Bovee, asked to have their names removed from the loyalty pledge. The trial examiner's report has considered the facts in detail and without reciting them it will suffice to say that there was ample testimony if he chose to believe it, as he did, to support the finding that they were discharged because of their affiliation with the C. I. O.

█ 3. The discharge of Eva Bellinger: She was a home worker whose production had been poor. The respondent claims she was discharged for inefficiency. Her daughter, Katheryn LaMont, whose discharge has already been discussed, had signed a C. I. O. card for her on October 18, 1945. Mrs. Bellinger testified that Mr. Edelstein fired her during a telephone conversation on the afternoon of October 22, 1945 after she had admitted in response to a question by him that she had joined the C. I. O. He denies that he ever had a telephone conversation with her. One or the other testified falsely. On a question of credibility where the trier of facts sees the witnesses, an appellate court is rarely justified in upsetting the finding. Moreover the coincidence in time, she and the others getting out on the same day, would seem somewhat significant.

█ Finally, it is vehemently urged that the trial examiner showed such partiality and bias as to require denial of an enforcement order. The gravamen of the charge is that he always gave credence to testimony favorable to the C. I. O. union and discredited witnesses whose testimony was unfavorable. It is true that in some cases trial examiners have followed this practice to such an extent as to cause courts to refuse enforcement of an order of the Board based on the examiner's report. See Pittsburgh S. S. Co. v. National Labor Relations Board, 6 Cir., 167 F.2d 126, app'l pen'g, and authorities there cited.

---

5 See note 4 supra.
6 In the case at bar the parties are in dispute whether the contract of September 18, 1945 was entered into with the purpose of forestalling activities on behalf of the C. I. O. union. In our view this issue is irrelevant.

But our examination of the present record does not convince us that this is a case of that character. The petition for enforcement is granted.