DECISION
Before this Court is an appeal from an August 17, 2005 decision by the Rhode Island State Labor Relations Board (the Labor Board), granting Motions to Dismiss that were filed by the defendants, the Rhode Island Turnpike and Bridge Authority (RITBA) and the Service Employees International Union, Local 134 (the incumbent union). The Motions to Dismiss concerned a "Petition by Employees for Investigation and Certification of Representatives" (petition for election) filed by the United Service and Service Workers of Rhode Island (the intervenor union) on behalf of RITBA employees pursuant to chapter 7 of title 28 of the Rhode Island General Laws, entitled the Labor Relations Act. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 Facts and Travel
The incumbent union and RITBA entered a three-year Collective Bargaining Agreement (CBA), effective July 1, 2002 to June 30, 2005.[1] In September 2004, the parties began negotiating a new CBA in anticipation of the expiration of the then-existing CBA. On January 25, 2005, the parties tentatively agreed to a new three-year CBA, effective July 1, 2005 to June 30, 2008. On January 26, 2005, RITBA's Board of Directors voted to accept the CBA, and two days later, covered employees voted to ratify it.
The new CBA significantly altered the terms of the employees' health care coverage by requiring RITBA to fully subsidize the medical services deductibles for each covered employee. On February 1, 2005, prior to the effective date of the new CBA, the covered employees began to receive the newly agreed-upon health care benefits. On March 16, 2005, RITBA and the incumbent union executed the new CBA.
On April 25, 2005, the intervenor union filed the petition for an election pursuant to G.L. 1956 § 28-7-9(b). On April 26, 2005, RITBA filed a letter of objection, and on May 20, 2005, the incumbent union and RITBA each filed a Motion to Dismiss with accompanying memoranda. On the same day, an administrator from the Labor Board conducted an informal hearing. All of the parties were present at the hearing. On May 27, 2005, the intervenor union filed a memorandum of law in opposition to the Motions to Dismiss. Thereafter, the Labor Board reviewed the filings and unanimously voted to grant the Motions to Dismiss on June 14, 2005. On August 17, 2005, the Labor Board issued a Decision and Order of Dismissal (Decision). Essentially, the Labor Board concluded that while the new CBA did not toll the window period for filing an election petition, the executed agreement acted as a bar to the petition. The intervenor union timely appealed the Decision to this Court.
 Standard of Review
The Superior Court reviews the decisions of the PUC and other state administrative agencies pursuant to § 42-35-15. Section42-35-15(g) provides:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or [sic] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This Court's review of an administrative agency decision under § 42-35-15 is limited in scope. See Mine Safety Appliances v.Berry, 620 A.2d 1255, 1259 (R.I. 1993). Thus, "[w]hen a trial court reviews a decision of an agency, the court may affirm or reverse the decision or may remand the case for further proceedings." Birchwood Realty, Inc. v. Grant, 627 A.2d 827,834 (R.I. 1993) (citing § 42-35-15(g)). It must give great deference to an agency's final decision. See Murray v.McWalters, 868 A.2d 659, 662 (R.I. 2005) ("The law in Rhode Island is well settled that an administrative agency will be accorded great deference in interpreting a statute whose administration and enforcement have been entrusted to the agency.") (quoting In re Lallo, 768 A.2d 921, 926 (R.I. 2001)).
This Court's review is restricted "to an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." JohnstonAmbulatory Surgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 805
(R.I. 2000) (emphasis added) (quoting Barrington Sch. Comm. v.R.I. State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992)). However, it is well settled that "[q]uestions of law . . . are not binding upon the court and may be reviewed to determine what the law is and its applicability to the facts."Narragansett Wire Co. v. Norberg, 118 R.I. 596, 607,376 A.2d 1, 6 (R.I. 1977).
 The Contentions of the Parties
The intervenor union asserts that it had the right to petition for an election on behalf of the employees pursuant to §28-7-9(b)(2), entitled "Rules and regulations" and otherwise known as the "contract-bar" doctrine. The intervenor union maintains that the Labor Board misconstrued § 28-7-9(b)(2) and Section 16 020 CRIR 8.06.1(c) of the Labor Board's Regulations when it decided not to conduct an election, and that it abused its discretion when it determined that the new CBA barred the petition.
In response, RITBA contends that the incumbent union's reliance on decisions of the National Labor Relations Board (NLRB) to explain the "contract-bar" doctrine was misplaced. It asserts that the National Labor Relations Act specifically excludes states and its political subdivisions from its provisions, and that RITBA, as a quasi-state agency, is not bound by NLRB policy, precedent, or doctrines. See National Labor Relations Act29 U.S.C. § 152(2). RITBA next maintains that pursuant to §28-7-9(b)(2), the Labor Board has discretionary authority to consider petitions for an election, and that it did not abuse its discretion when it found the new CBA acted as a bar to the petition. RITBA finally contends that the intervenor union should be estopped from challenging the new CBA under the doctrine of laches because it had full knowledge of the agreement before it was signed.
In a reply memorandum, the intervenor union asserts that laches should not apply because it was statutorily prohibited from challenging the proposed agreement outside a prescribed window of opportunity. See § 28-7-9(b)(2). In an accompanying affidavit, the Financial Secretary-Treasurer for the intervenor union stated that at the informal hearing, he told RITBA and an administrator from the Labor Board that his union had no intention of repudiating the new CBA and causing labor strife if it were to prevail in the proposed election.
 Statutory Construction
At issue in this case is the interpretation of Rhode Island Labor Relations Act and its related regulations. It is well established that the interpretation of a statute is a question of law. See Palazzolo v. State ex rel. Tavares, 746 A.2d 707,711 (R.I. 2000). Where the language of a statute "is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." Retirement Bd. of Employees' RetirementSystem of State v. DiPrete, 845 A.2d 270, 297 (R.I. 2004) (internal quotations omitted). When "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written." Id.
In Rhode Island, "[o]ur process of statutory construction further involves a `practice of construing and applying apparently inconsistent statutory provisions in such a manner so as to avoid the inconsistency.'" Kells v. Town of Lincoln,874 A.2d 204, 212 (R.I. 2005) (quoting Montaquila v. St. Cyr,433 A.2d 206, 214 (R.I. 1981)). Furthermore, where "the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference, as long as that construction is not clearly erroneous or unauthorized."Labor Ready Northeast, Inc. v. McConaghy, 849 A.2d 340, 345
(R.I. 2004). However, "[a]n agency cannot modify the statutory provisions under which it acquired power, unless such an intent is clearly expressed in the statute." Little v. Conflict ofInterest Commission, 121 R.I. 232, 236, 397 A.2d 884, 886
(1979).
With respect to an agency's regulations, when they "are duly promulgated by an administrative agency like the commission, pursuant to a specific grant of legal authority to do so, [they] are legislative rules that carry the force and effect of law and thus enjoy a presumption of validity." In re Advisory Opinion tothe Governor, 732 A.2d 55, 75 (R.I. 1999). Great deference is accorded "to an administrative agency's interpretation of its enabling law, as reflected in its regulations. . . ." Id. at 76 (quoting Parkway Towers Associates v. Godfrey, 688 A.2d 1289,1293 (R.I. 1997)). Furthermore, "deference will be accorded to an administrative agency when it interprets [enabling provisions] whose administration and enforcement have been entrusted to the agency . . . even when the agency's interpretation is not the only permissible interpretation that could be applied." In reAdvisory Opinion to the Governor, 732 A.2d at 76 (quotingPawtucket Power Associates Limited Partnership v. City ofPawtucket, 622 A.2d 452, 456-57 (R.I. 1993)).
However, the "deference due to an agency's interpretation of its governing statute and regulations is far from blind allegiance." Citizens Savings Bank v. Bell, 605 F. Supp 1033,1042 (D.R.I. 1985). That is because an administrative agency's determinations of law, "are not binding on the reviewing court; they `may be reviewed to determine what the law is and its applicability to the facts.'" Gott v. Norberg, 417 A.2d 1352,1361 (R.I. 1980) (quoting Narragansett Wire Co. v. Norberg,118 R.I. 596, 376 A.2d 1, 6 (1977)). Furthermore, it must be remembered that "[t]his Court will not construe a statute to reach an absurd result." State v. Flores, 714 A.2d 581, 583
(R.I. 1998) (quoting Kaya v. Partington, 681 A.2d 256, 261
(R.I. 1996)).
 The "Contract-Bar" Doctrine
The provision at issue in this case is § 28-7-9(b)(2). It establishes a mechanism for the decertification of a union by expressly codifying the "contract-bar" doctrine, so called. RITBA asserts that the incumbent union's reliance on NLRB decisions was misplaced because the National Labor Relations Act excludes states and their subdivisions from its provisions. However, although the National Labor Relations Act specifically excludes "any State or political subdivision thereof" from its definition of employer, the Rhode Island Labor Relations Act does not contain such an exclusion. Compare 29 U.S.C. 152(2) with §28-7-3(4). In fact, the Rhode Island Labor Relations Act specifically contemplates the participation of the public sector in the collective bargaining process. See § 28-7-13.1, entitled "Unfair labor practices — Public sector employee organizations." Consequently, this Court will look to federal law for guidance.See Board of Trustees, Robert H. Champlin Memorial Library v.Rhode Island State Labor Relations Board, 694 A.2d 1185, 1189
(R.I. 1997) (expressing a "willingness to look to federal labor law for guidance in resolving labor questions. . . .");Fraternal Order of Police, Westerly Lodge No. 10 v. Town ofWesterly, 659 A.2d 1104, 1108 (R.I. 1995) (observing that the "Rhode Island Supreme Court has used federal labor practice for guidance.")
The "contract-bar" doctrine was created by the NLRB in order to "promote industrial peace by stabilizing, for a reasonable time, a contractual relationship between employer and union." NLRB v.F A Food Sales, Inc., 202 F.3d 1258, 1261 (10th Cir. 2000) (citation omitted); see also NLRB v. Dominick's Finer Foods,Inc., 28 F.3d 678, 683 (7th Cir. 1994) ("The contract bar rule is not statutorily or judicially mandated, but is a creation of the Board . . . in an effort to reconcile the [National Labor Relations Act's] goals of promoting industrial stability and employee freedom of choice.") (Internal quotations omitted.)
Under "contract-bar" the doctrine, "a collective bargaining agreement protects an existing bargaining relationship from challenge for the contract term." Dominick's Finer Foods, Inc.,28 F.3d at 683 (emphasis added.) The NLRB "will generally refuse decertification elections, whether requested by the employer, the employees or another union, for the life of the collective bargaining contract. Id. Accordingly, "a valid contract not exceeding three years in duration will bar a representation election unless a petition is filed more than 60 and less than 90 days before the end of the contract." Id. (emphasis added);see also F A Food Sales, Inc., 202 F.3d at 1261, n1 (observing that "the Board has established a thirty-day `open period' beginning ninety days before the expiration of the contract and ending sixty days before the expiration of the contract, during which election petitions may be filed.") Moreover, "[t]he 60-90 day period is strictly construed . . . and the rule applies `even if a majority of the employees represented by the union withdraw their support.'" Finer Foods,Inc., 28 F.3d at 683 (quoting El Torito-La Fiesta Restaurants,Inc. v. NLRB, 929 F.2d 490, 492 (9th Cir. 1991) (emphasis added).
At the conclusion of the thirty-day window period, "the final 60 days of the existing collective-bargaining agreement is an `insulated period' during which the contract bars petitions for elections." Crompton Company, Inc., v. NLRB, 260 N.L.R.B. 417, 418 (1982). The rules under the "contract-bar" doctrine serve two objectives:
 "First, they further industrial peace and stability by assuring that the labor relations environment will not be disrupted during the term of a collective-bargaining agreement and by providing the parties with a period just before the expiration of the contract during which they can negotiate a new agreement free from such disruption. Equally important, however, the rules provide a set opportunity for employees who are disenchanted with the performance of their collective-bargaining representative to seek its removal or replacement with another representative." Id.
See also NLRB v. Geraldine Novelty Company, Inc.,173 F.2d 14, 17 ("A necessary corollary of [industrial peace] is that employees must have the privilege at some time to campaign for a rival union in spite of an existing contract, else the union which first got in could remain indefinitely as the bargaining representative by simply renewing its contract before, or immediately after, the expiration of the contract term.")
Section 28-7-2 articulates the policies underlying the Rhode Island Labor Act. It provides in pertinent part:
 "In the interpretation and application of this chapter and otherwise, it is declared to be the public policy of the state to encourage the practice and procedure of collective bargaining, and to protect employees in the exercise of full freedom of association, self organization, and designation of representatives of their own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint, or coercion of their employers." Section 28-7-9(d) (emphases added).
Section § 28-7-2(e) mandates that "[a]ll the provisions of this chapter shall be liberally construed for the accomplishment of this purpose."
To achieve its goals, the Labor Relations Act guarantees employees "the right of self organization, to form, join, or assist labor organizations, to bargain collectively throughrepresentatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection free from interference, restraint, or coercion from any source." Section 28-7-12 (emphases added.) However, these rights are limited by § 28-7-9. Section28-7-9(b)(1) requires "a labor organization to submit cards of interest signed by at least thirty percent (30%) of the employees in the appropriate bargaining unit indicating a desire to be represented by the labor organization so designated." In this case, it is undisputed that such requirement was met.[2]
As noted above, § 28-7-9(b)(2) codifies the "contract-bar" doctrine. It provides:
 "The board shall not consider a petition for representation whenever it appears that a collective bargaining agreement is in existence; provided, that the board may consider a petition within a thirty (30) day period immediately preceding sixty (60) days prior to the expiration date of the collective bargaining agreement." Section 28-7-9(b)(2).
Presumably, when the Legislature enacted this provision, it was aware of how federal case law has interpreted the doctrine, and it implicitly adopted the same approach for Rhode Island. Furthermore, the "contract-bar" doctrine comports with the legislative goal of promoting collective bargaining by attempting to remove "certain recognized sources of industrial strife and unrest, [and] encourage[ing] practices fundamental to the friendly adjustment of industrial disputes. . . ." Section28-7-2(c). To achieve this goal, the Legislature attempts to equalize the bargaining power between and among employers and employees. See id.; see also § 28-7-13 (specifying various unfair labor practices); §§ 28-7-20 through 28-7-48
(establishing a framework to halt unfair labor practices).
In the present case, the incumbent union entered into a three-year CBA with RITBA, effective July 1, 2002 to June 30, 2005; thus the statutory window period for filing a petition for an election opened on approximately April 2, 2005, and lasted until approximately May 1, 2005. The intervenor union filed its petition on April 25, 2005; thus, its petition was squarely within the statutory thirty-day window period.
In its decision, the Labor Board relied upon § 28-7-9(b) to conclude that it has discretionary power to consider, or not to consider, an election petition. See § 28-7-9(b) ("[T]he boardmay consider a petition within a thirty (30) day period immediately preceding sixty (60) days prior to the expiration date of the collective bargaining agreement.") (Emphasis added). Nevertheless, because the Labor Board actually addressed the merits of the intervenor union's petition, this Court need not deliberate on whether the Labor Board has discretionary authority to consider such petitions under § 28-7-9(b)(2). Suffice it to say, however, considering that § 28-7-12 expressly confers upon employees the right to choose their own representatives, it would appear that the Labor Board's discretion, if any, to reject a timely petition for an election is not unfettered.[3]
In reaching its decision, the Labor Board relied on Section 16 020 CRIR 8.06 of its Regulations, entitled "Petition for Decertification." That section provides in pertinent part:
 "No election for decertification may be conducted when there exists a Collective Bargaining Agreement; provided, that the Board may consider such petition within a thirty (30) day period immediately preceding sixty (60) days prior to the expiration if such Collective Bargaining Agreement. To serve as a "bar" to decertification, the contract must:
 1) Be in writing and be signed by the employer and the labor organization;
 2) Address substantial terms and conditions of employment; and
 3) Exist for a definite duration." Section 16 020 CRIR 8.06.1(c).
The Labor Board found that RITBA and the incumbent union satisfied conditions one and three of Section 16 020 CRIR 8.06.1(c) when it signed the new three-year agreement with an effective date of July 1, 2005, through June 30, 2008. Decision
at 5. It also found that the new CBA addressed all the terms and conditions of employment. Id. It then stated:
 "The Petitioner's sole argument seems to be that parties to a collective bargaining agreement should never be allowed to negotiate successor agreements prior to a window period in order to allow rival unions to file petitions for representation. Such a position seems, to the Board, to turn the notion of labor stability and peace on its head. This Board is required to and tries to do all it can to foster labor peace and stable labor relations in the State of Rhode Island. In this case, the parties to an existing agreement took the time and energy to negotiate a contract in good faith prior to the expiration, apparently motivated in part by an effort to deal with health care provisions." Id.
This Court finds that the Board's conclusion that the new CBA barred the election petition was erroneous as a matter of law. Section 28-7-9(b)(2) clearly states that when there is an existing CBA, the Labor Board may consider a petition for representation only when it is filed during the statutory thirty-day window. At the time of the petition, the only effective CBA in existence was the July 1, 2002 to June 30, 2005 CBA. The Labor Board recognized this fact when it properly found that the intervenor union had complied with the statutory thirty-day "window period." Decision at 5. However, it then considered the new CBA as grounds for rejecting the petition. That CBA was not in effect at the time; thus, it was not an existing contract for purposes of § 28-7-9(b)(2) and should not have been considered as justification for rejecting the petition for an election.
Furthermore, even if the new CBA became effective upon execution on March 15, 2005, it still would not have served as a bar to the petition due to the premature extension doctrine. A contract is
 "considered prematurely extended if during its term the contracting parties execute an amendment thereto or a new contract which contains a later terminal date than that of an existing contract, except when executed (1) during the 60-day insulated period preceding the terminal date of the old contract; (2) after the terminal date of the old contract; or (3) at a time when the existing contract would not have barred an election because of other contract-bar rules." Deluxe Metal Furniture Co., v. NLRB,
121 N.L.R.B. 995, 1001 (1958).
In situations "where an employer and a union before the expiration date of an existing contract execute a new contract extending the same collective bargaining status for a further period, the new contract will not be held as a bar to a redetermining of the bargaining representative prior to the expiration of the original contract." Geraldine Novelty Company,Inc., 173 F.2d at 17. That is because "[a]ny other conclusion would seat the existing representative permanently in the saddle, since neither the rival union nor the employees who desired a change could know when the new contract would be made and therefore could not foretell when it would be appropriate to start electioneering." Id.
In the instant matter, the new CBA was executed before the statutory thirty-day window in which a petition for representation could have been filed.[4] By relying on the new CBA to deny the petition, the Labor Board effectively cut off the employees' statutorily guaranteed right to petition for an election. Under the Labor Board's Decision, the employees now would have to wait until the thirty-day period immediately preceding sixty days prior to the expiration of the new CBA before they could attempt again to obtain new representation.
Furthermore, considering that § 28-7-9(b)(1) requires only thirty percent of the workforce to indicate a desire to change representation, it is conceivable that a majority of the employees cut off the rights of a minority by repeatedly ratifying premature CBAs. See Section 28-7-9(b)(1) ("The board shall require a labor organization to submit cards of interest signed by at least thirty percent (30%) of the employees in the appropriate bargaining unit indicating a desire to be represented by the labor organization so designated.") Such a result undercuts the purpose Lab or Act and would lead to an absurd result. Consequently, viewing the Labor Act as a whole, and mindful that it must be construed liberally, this Court concludes that the Labor Board erroneously denied the petition for an election when it granted the Motions to Dismiss filed by the incumbent union and RITBA.
 Conclusion
This Court finds that the Labor Board's granting of the Motions to Dismiss was in violation of statutory and regulatory provisions, was in excess of the authority granted to the Labor Board, and was arbitrary and capricious. The Labor Board's decision also was affected by error of law and was characterized by an abuse of discretion. Substantial rights of the intervenor union have been prejudiced. Accordingly, this Court reverses the Labor Board's decision.
Counsel shall submit an appropriate order consistent with this decision.
[1] There is no record of the informal proceedings before the state Labor Relations Board (the Labor Board); consequently, this Court has gleaned the facts from the Labor Board's written decision.
[2] In her brief to this Court, counsel for the intervenor union states that the "petition was signed by all but two employees." Brief of Intervenor Union at 4.
[3] See Carlson v. McLyman, 77 R.I. 177, 182, 74 A.2d 853,855 (1950) ("[T]he ordinary meaning of the word `may' is permissive and not compulsive; yet whether it should be . . . construed as `shall' in a given case depends on the intent of the legislature as ascertained from the language, the nature, and the object of the statute.") (citing Nolan v. Representative Councilof City of Newport, 73 R.I. 498, 503, 57 A.2d 730, 733 (1948)).
[4] RIBTA asserts that the doctrine of laches should apply because the intervenor union was aware of the negotiations but did not inform anyone of its intention to intervene before the agreement was signed. The intervenor union disputes such assertion, stating that in 2003, it announced its intention to seek representation of all units represented by the incumbent union. Indeed, this announcement arguably could have prompted the incumbent union and RITBA to enter into early negotiations. Furthermore, even if the intervenor union was aware of the negotiations, Section 28-7-9(b)(2) precluded it from taking any action until the thirty-day window opened on the existing CBA. Additionally, the right to petition belongs to the employees, not to the intervenor union; consequently, it aopears to this Court that application of the doctrine of laches against the intervenor union would erroneously deny those employees of their right to choose their own representation.